(Slip Opinion)          OCTOBER  TERM,  2014          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## COMPTROLLER OF THE TREASURY OF MARYLAND *v*. WYNNE ET UX.

### CERTIORARI TO THE COURT OF APPEALS OF MARYLAND

No. 13–485.   Argued November 12, 2014—Decided May 18, 2015

Maryland's personal income tax on state residents consists of a "state" income tax, Md. Tax-Gen. Code Ann. §10–105(a), and a "county" income tax, §§10–103, 10–106.  Residents who pay income tax to another jurisdiction for income earned in that other jurisdiction are allowed a credit against the "state" tax but not the "county" tax.  §10–703.  Nonresidents who earn income from sources within Maryland must pay the "state" income tax, §§10–105(d), 10–210, and nonresidents not subject to the county tax must pay a "special nonresident tax" in lieu of the "county" tax, §10–106.1.

Respondents, Maryland residents, earned pass-through income from a Subchapter S corporation that earned income in several States.  Respondents claimed an income tax credit on their 2006 Maryland income tax return for taxes paid to other States.  The Maryland State Comptroller of the Treasury, petitioner here, allowed respondents a credit against their "state" income tax but not against their "county" income tax and assessed a tax deficiency.  That decision was affirmed by the Hearings and Appeals Section of the Comptroller's Office and by the Maryland Tax Court, but the Circuit Court for Howard County reversed on the ground that Maryland's tax system violated the Commerce Clause of the Federal Constitution.  The Court of Appeals of Maryland affirmed and held that the tax unconstitutionally discriminated against interstate commerce.

*Held*: Maryland's personal income tax scheme violates the dormant Commerce Clause.  Pp. 4–28.

(a) The Commerce Clause, which grants Congress power to "regulate Commerce . . . among the several States," Art I, §8, cl. 3, also has "a further, negative command, known as the dormant Commerce Clause," *Oklahoma Tax Comm'n* v. *Jefferson Lines, Inc.*, 514 U. S.

Syllabus

175, 179, which precludes States from "discriminat[ing] between transactions on the basis of some interstate element," *Boston Stock Exchange* v. *State Tax Comm'n*, 429 U. S. 318, 332, n. 12. Thus, *inter alia,* a State "may not tax a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State," *Armco Inc.* v. *Hardesty*, 467 U. S. 638, 642, or "impose a tax which discriminates against interstate commerce either by providing a direct commercial advantage to local business, or by subjecting interstate commerce to the burden of 'multiple taxation,'" *Northwestern States Portland Cement Co.* v. *Minnesota,* 358 U. S. 450, 458.  Pp. 4–6.

(b) The result in this case is all but dictated by this Court's dormant Commerce Clause cases, particularly *J. D. Adams Mfg. Co.* v. *Storen*, 304 U. S. 307, 311, *Gwin, White & Prince, Inc.* v. *Henneford*, 305 U. S. 434, 439, and *Central Greyhound Lines, Inc.* v. *Mealey*, 334 U. S. 653, 662, which all invalidated state tax schemes that might lead to double taxation of out-of-state income and that discriminated in favor of intrastate over interstate economic activity. Pp. 6–7.

(c) This conclusion is not affected by the fact that these three cases involved a tax on gross receipts rather than net income, and a tax on corporations rather than individuals.  This Court's decisions have previously rejected the formal distinction between gross receipts and net income taxes.  And there is no reason the dormant Commerce Clause should treat individuals less favorably than corporations; in addition, the taxes invalidated in *J. D. Adams* and *Gwin, White* applied to the income of both individuals and corporations.  Nor does the right of the individual to vote in political elections justify disparate treatment of corporate and personal income.  Thus the Court has previously entertained and even sustained dormant Commerce Clause challenges by individual residents of the State that imposed the alleged burden on interstate commerce.  See *Department of Revenue of Ky.* v. *Davis*, 553 U. S. 328, 336; *Granholm* v. *Heald*, 544 U. S. 460, 469 (2005).  Pp. 7–12.

(d) Maryland's tax scheme is not immune from dormant Commerce Clause scrutiny simply because Maryland has the jurisdictional power under the Due Process Clause to impose the tax.  "[W]hile a state may, consistent with the Due Process Clause, have the authority to tax a particular taxpayer, imposition of the tax may nonetheless violate the Commerce Clause." *Quill Corp.* v. *North Dakota*, 504 U. S. 298, 305.  Pp. 12–15.

(e) Maryland's income tax scheme discriminates against interstate commerce.  The "internal consistency" test, which helps courts identify tax schemes that discriminate against interstate commerce, as-

Syllabus

sumes that every State has the same tax structure. Maryland's income tax scheme fails the internal consistency test because if every State adopted Maryland's tax structure, interstate commerce would be taxed at a higher rate than intrastate commerce. Maryland's tax scheme is inherently discriminatory and operates as a tariff, which is fatal because tariffs are "[t]he paradigmatic example of a law discriminating against interstate commerce." *West Lynn Creamery, Inc.* v. *Healy*, 512 U. S. 186, 193. Petitioner emphasizes that by offering residents who earn income in interstate commerce a credit against the "state" portion of the income tax, Maryland actually receives less tax revenue from residents who earn income from interstate commerce rather than intrastate commerce, but this argument is a red herring. The critical point is that the total tax burden on interstate commerce is higher. Pp. 18–26.

431 Md. 147, 64 A. 3d 453, affirmed.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, BREYER, and SOTOMAYOR, JJ., joined. SCALIA, J., filed a dissenting opinion, in which THOMAS, J., joined as to Parts I and II. THOMAS, J., filed a dissenting opinion, in which SCALIA, J., joined except as to the first paragraph. GINSBURG, J., filed a dissenting opinion, in which SCALIA and KAGAN, JJ., joined.

1

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–485

_____

## COMPTROLLER OF THE TREASURY OF MARYLAND, PETITIONER *v.* BRIAN WYNNE ET UX.

### ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF MARYLAND

[May 18, 2015]

JUSTICE ALITO delivered the opinion of the Court.

This case involves the constitutionality of an unusual feature of Maryland's personal income tax scheme. Like many other States, Maryland taxes the income its residents earn both within and outside the State, as well as the income that nonresidents earn from sources within Maryland. But unlike most other States, Maryland does not offer its residents a full credit against the income taxes that they pay to other States. The effect of this scheme is that some of the income earned by Maryland residents outside the State is taxed twice. Maryland's scheme creates an incentive for taxpayers to opt for intrastate rather than interstate economic activity.

We have long held that States cannot subject corporate income to tax schemes similar to Maryland's, and we see no reason why income earned by individuals should be treated less favorably. Maryland admits that its law has the same economic effect as a state tariff, the quintessential evil targeted by the dormant Commerce Clause. We therefore affirm the decision of Maryland's highest court and hold that this feature of the State's tax scheme vio-

lates the Federal Constitution.

## I

Maryland, like most States, raises revenue in part by levying a personal income tax. The income tax that Maryland imposes upon its own residents has two parts: a "state" income tax, which is set at a graduated rate, Md. Tax-Gen. Code Ann. §10–105(a) (Supp. 2014), and a so-called "county" income tax, which is set at a rate that varies by county but is capped at 3.2%, §§10–103, 10–106 (2010). Despite the names that Maryland has assigned to these taxes, both are State taxes, and both are collected by the State's Comptroller of the Treasury. *Frey* v. *Comptroller of Treasury*, 422 Md. 111, 125, 141–142, 29 A. 3d 475, 483, 492 (2011). Of course, some Maryland residents earn income in other States, and some of those States also tax this income. If Maryland residents pay income tax to another jurisdiction for income earned there, Maryland allows them a credit against the "state" tax but not the "county" tax. §10–703; 431 Md. 147, 156–157, 64 A. 3d 453, 458 (2013) (case below). As a result, part of the income that a Maryland resident earns outside the State may be taxed twice.

Maryland also taxes the income of nonresidents. This tax has two parts. First, nonresidents must pay the "state" income tax on all the income that they earn from sources within Maryland. §§10–105(d) (Supp. 2014), 10–210 (2010). Second, nonresidents not subject to the county tax must pay a "special nonresident tax" in lieu of the "county" tax. §10–106.1; *Frey*, *supra*, at 125–126, 29 A. 3d, at 483. The "special nonresident tax" is levied on income earned from sources within Maryland, and its rate is "equal to the lowest county income tax rate set by any Maryland county." §10–106.1. Maryland does not tax the income that nonresidents earn from sources outside Maryland. See §10–210.

Respondents Brian and Karen Wynne are Maryland residents. In 2006, the relevant tax year, Brian Wynne owned stock in Maxim Healthcare Services, Inc., a Subchapter S corporation.[1] That year, Maxim earned income in States other than Maryland, and it filed state income tax returns in 39 States. The Wynnes earned income passed through to them from Maxim. On their 2006 Maryland tax return, the Wynnes claimed an income tax credit for income taxes paid to other States.

Petitioner, the Maryland State Comptroller of the Treasury, denied this claim and assessed a tax deficiency. In accordance with Maryland law, the Comptroller allowed the Wynnes a credit against their Maryland "state" income tax but not against their "county" income tax. The Hearings and Appeals Section of the Comptroller's Office slightly modified the assessment but otherwise affirmed. The Maryland Tax Court also affirmed, but the Circuit Court for Howard County reversed on the ground that Maryland's tax system violated the Commerce Clause.

The Court of Appeals of Maryland affirmed. 431 Md. 147, 64 A. 3d 453. That court evaluated the tax under the four-part test of *Complete Auto Transit, Inc.* v. *Brady*, 430

---

[1] Under federal law, S corporations permit shareholders "to elect a 'pass-through' taxation system under which income is subjected to only one level of taxation. The corporation's profits pass through directly to its shareholders on a pro rata basis and are reported on the shareholders' individual tax returns." *Gitlitz* v. *Commissioner*, 531 U. S. 206, 209 (2001) (citation omitted). Maryland affords similar pass-through treatment to the income of an S corporation. 431 Md. 147, 158, 64 A. 3d 453, 459 (2013). By contrast, C corporations—organized under Subchapter C rather than S of Chapter 1 of the Internal Revenue Code—must pay their own taxes because they are considered to be separate tax entities from their shareholders. 14A W. Fletcher, Cyclopedia of the Law of Corporations §§6971, 6973 (rev. ed. 2008 and Cum. Supp. 2014–2015). Because of limitations on the number and type of shareholders they may have, S corporations tend to be smaller, more closely held corporations. *Id.,* §§7025.50, 7026.

U. S. 274 (1977), which asks whether a "tax is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." *Id.,* at 279.  The Court of Appeals held that the tax failed both the fair apportionment and nondiscrimination parts of the *Complete Auto* test.  With respect to fair apportionment, the court first held that the tax failed the "internal consistency" test because if every State adopted Maryland's tax scheme, interstate commerce would be taxed at a higher rate than intrastate commerce.  It then held that the tax failed the "external consistency" test because it created a risk of multiple taxation.  With respect to nondiscrimination, the court held that the tax discriminated against interstate commerce because it denied residents a credit on income taxes paid to other States and so taxed income earned interstate at a rate higher than income earned intrastate.  The court thus concluded that Maryland's tax scheme was unconstitutional insofar as it denied the Wynnes a credit against the "county" tax for income taxes they paid to other States.  Two judges dissented and argued that the tax did not violate the Commerce Clause.  The Court of Appeals later issued a brief clarification that "[a] state may avoid discrimination against interstate commerce by providing a tax credit, or some other method of apportionment, to avoid discriminating against interstate commerce in violation of the dormant Commerce Clause."  431 Md., at 189, 64 A. 3d at 478.

We granted certiorari.  572 U. S. ___ (2014).

## II

### A

The Commerce Clause grants Congress power to "regulate Commerce . . . among the several States."  Art. I, § 8, cl. 3.  These "few simple words . . . reflected a central

concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Hughes* v. *Oklahoma*, 441 U. S. 322, 325–326 (1979). Although the Clause is framed as a positive grant of power to Congress, "we have consistently held this language to contain a further, negative command, known as the dormant Commerce Clause, prohibiting certain state taxation even when Congress has failed to legislate on the subject." *Oklahoma Tax Comm'n* v. *Jefferson Lines, Inc.*, 514 U. S. 175, 179 (1995).

This interpretation of the Commerce Clause has been disputed. See *Camps Newfound/Owatonna, Inc.* v. *Town of Harrison*, 520 U. S. 564, 609–620 (1997) (THOMAS, J., dissenting); *Tyler Pipe Industries, Inc.* v. *Washington State Dept. of Revenue*, 483 U. S. 232, 259–265 (1987) (SCALIA, J., concurring in part and dissenting in part); *License Cases*, 5 How. 504, 578–579 (1847) (Taney, C. J.). But it also has deep roots. See, *e.g., Case of the State Freight Tax*, 15 Wall. 232, 279–280 (1873); *Cooley* v. *Board of Wardens of Port of Philadelphia ex rel. Soc. for Relief of Distressed Pilots*, 12 How. 299, 318–319 (1852); *Gibbons* v. *Ogden*, 9 Wheat. 1, 209 (1824) (Marshall, C. J.). By prohibiting States from discriminating against or imposing excessive burdens on interstate commerce without congressional approval, it strikes at one of the chief evils that led to the adoption of the Constitution, namely, state tariffs and other laws that burdened interstate commerce. *Fulton Corp.* v. *Faulkner*, 516 U. S. 325, 330–331 (1996); *Hughes*, *supra*, at 325; *Welton* v. *Missouri*, 91 U. S. 275, 280 (1876); see also The Federalist Nos. 7, 11 (A. Hamilton), and 42 (J. Madison).

Under our precedents, the dormant Commerce Clause

precludes States from "discriminat[ing] between transactions on the basis of some interstate element." *Boston Stock Exchange* v. *State Tax Comm'n*, 429 U. S. 318, 332, n. 12 (1977). This means, among other things, that a State "may not tax a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State." *Armco Inc.* v. *Hardesty*, 467 U. S. 638, 642 (1984). "Nor may a State impose a tax which discriminates against interstate commerce either by providing a direct commercial advantage to local business, or by subjecting interstate commerce to the burden of 'multiple taxation.'" *Northwestern States Portland Cement Co.* v. *Minnesota*, 358 U. S. 450, 458 (1959) (citations omitted).

B

Our existing dormant Commerce Clause cases all but dictate the result reached in this case by Maryland's highest court. Three cases involving the taxation of the income of domestic corporations are particularly instructive.

In *J. D. Adams Mfg. Co.* v. *Storen*, 304 U. S. 307 (1938), Indiana taxed the income of every Indiana resident (including individuals) and the income that every nonresident derived from sources within Indiana. *Id.,* at 308. The State levied the tax on income earned by the plaintiff Indiana corporation on sales made out of the State. *Id.,* at 309. Holding that this scheme violated the dormant Commerce Clause, we explained that the "vice of the statute" was that it taxed, "without apportionment, receipts derived from activities in interstate commerce." *Id*., at 311. If these receipts were also taxed by the States in which the sales occurred, we warned, interstate commerce would be subjected "to the risk of a double tax burden to which intrastate commerce is not exposed, and which the commerce clause forbids." *Ibid.*

The next year, in *Gwin, White & Prince, Inc.* v. *Henneford*, 305 U. S. 434 (1939), we reached a similar

result. In that case, the State of Washington taxed all the income of persons doing business in the State. *Id.,* at 435. Washington levied that tax on income that the plaintiff Washington corporation earned in shipping fruit from Washington to other States and foreign countries. *Id.,* at 436–437. This tax, we wrote, "discriminates against interstate commerce, since it imposes upon it, merely because interstate commerce is being done, the risk of a multiple burden to which local commerce is not exposed." *Id.,* at 439.

In the third of these cases involving the taxation of a domestic corporation, *Central Greyhound Lines, Inc.* v. *Mealey*, 334 U. S. 653 (1948), New York sought to tax the portion of a domiciliary bus company's gross receipts that were derived from services provided in neighboring States. *Id.,* at 660; see also *id.,* at 665 (Murphy, J., dissenting) (stating that the plaintiff was a New York corporation). Noting that these other States might also attempt to tax this portion of the company's gross receipts, the Court held that the New York scheme violated the dormant Commerce Clause because it imposed an "unfair burden" on interstate commerce. *Id.*, at 662 (majority opinion).

In all three of these cases, the Court struck down a state tax scheme that might have resulted in the double taxation of income earned out of the State and that discriminated in favor of intrastate over interstate economic activity. As we will explain, see Part II–F, *infra*, Maryland's tax scheme is unconstitutional for similar reasons.

C

The principal dissent distinguishes these cases on the sole ground that they involved a tax on gross receipts rather than net income. We see no reason why the distinction between gross receipts and net income should matter, particularly in light of the admonition that we must consider "not the formal language of the tax statute

but rather its practical effect." *Complete Auto*, 430 U. S., at 279. The principal dissent claims, *post*, at 13 (opinion of GINSBURG, J.), that "[t]he Court, *historically*, has taken the position that the difference between taxes on net income and taxes on gross receipts from interstate commerce warrants different results." 2 C. Trost & P. Hartman, Federal Limitations on State and Local Taxation 2d §10:1, p. 251 (2003) (emphasis added) (hereinafter Trost). But this historical point is irrelevant. As the principal dissent seems to acknowledge, our cases rejected this formal distinction some time ago. And the distinction between gross receipts and net income taxes was not the basis for our decisions in *J. D. Adams*, *Gwin, White*, and *Central Greyhound*, which turned instead on the threat of multiple taxation.

The discarded distinction between taxes on gross receipts and net income was based on the notion, endorsed in some early cases, that a tax on gross receipts is an impermissible "direct and immediate burden" on interstate commerce, whereas a tax on net income is merely an "indirect and incidental" burden. *United States Glue Co.* v. *Town of Oak Creek*, 247 U. S. 321, 328–329 (1918); see also *Shaffer* v. *Carter*, 252 U. S. 37, 57 (1920). This arid distinction between direct and indirect burdens allowed "very little coherent, trustworthy guidance as to tax validity." 2 Trost §9:1, at 212. And so, beginning with Justice Stone's seminal opinion in *Western Live Stock* v. *Bureau of Revenue*, 303 U. S. 250 (1938), and continuing through cases like *J. D. Adams* and *Gwin, White*, the direct-indirect burdens test was replaced with a more practical approach that looked to the economic impact of the tax. These cases worked "a substantial judicial reinterpretation of the power of the States to levy taxes on gross income from interstate commerce." 1 Trost §2:20, at 175.

After a temporary reversion to our earlier formalism, see *Spector Motor Service, Inc.* v. *O'Connor*, 340 U. S. 602

(1951), "the gross receipts judicial pendulum has swung in a wide arc, recently reaching the place where taxation of gross receipts from interstate commerce is placed on an equal footing with receipts from local business, in *Complete Auto Transit Inc.* v. *Brady*," 2 Trost §9:1, at 212. And we have now squarely rejected the argument that the Commerce Clause distinguishes between taxes on net and gross income. See *Jefferson Lines*, 514 U. S., at 190 (explaining that the Court in *Central Greyhound* "understood the gross receipts tax to be simply a variety of tax on income"); *Moorman Mfg. Co.* v. *Bair*, 437 U. S. 267, 280 (1978) (rejecting a suggestion that the Commerce Clause distinguishes between gross receipts taxes and net income taxes); *id.,* at 281 (Brennan, J., dissenting) ("I agree with the Court that, for purposes of constitutional review, there is no distinction between a corporate income tax and a gross-receipts tax"); *Complete Auto*, *supra*, at 280 (upholding a gross receipts tax and rejecting the notion that the Commerce Clause places "a blanket prohibition against any state taxation imposed directly on an interstate transaction").[2]

For its part, petitioner distinguishes *J. D. Adams*, *Gwin, White*, and *Central Greyhound* on the ground that they concerned the taxation of corporations, not individuals. But it is hard to see why the dormant Commerce Clause should treat individuals less favorably than corporations.

---

[2] The principal dissent mischaracterizes the import of the Court's statement in *Moorman* that a gross receipts tax is "'more burdensome'" than a net income tax. *Post*, at 13. This was a statement about the relative economic impact of the taxes (a gross receipts tax applies regardless of whether the corporation makes a profit). It was not, as Justice Brennan confirmed in dissent, a suggestion that net income taxes are subject to lesser constitutional scrutiny than gross receipts taxes. Indeed, we noted in *Moorman* that "the actual burden on interstate commerce would have been the same had Iowa imposed a plainly valid gross-receipts tax instead of the challenged [net] income tax." *Moorman Mfg. Co.* v. *Bair*, 437 U. S. 267, 280–281 (1978).

See *Camps Newfound*, 520 U. S., at 574 ("A tax on real estate, *like any other tax*, may impermissibly burden interstate commerce" (emphasis added)).  In addition, the distinction between individuals and corporations cannot stand because the taxes invalidated in *J. D. Adams* and *Gwin, White* applied to the income of both individuals and corporations.  See Ind. Stat. Ann., ch. 26, §64–2602 (Burns 1933) (tax in *J. D. Adams*); 1935 Wash. Sess. Laws ch. 180, Tit. II, §4(e), pp. 710–711 (tax in *Gwin, White*).

Attempting to explain why the dormant Commerce Clause should provide less protection for natural persons than for corporations, petitioner and the Solicitor General argue that States should have a free hand to tax their residents' out-of-state income because States provide their residents with many services.  As the Solicitor General puts it, individuals "reap the benefits of local roads, local police and fire protection, local public schools, [and] local health and welfare benefits."  Brief for United States as *Amicus Curiae* 30.

This argument fails because corporations also benefit heavily from state and local services.  Trucks hauling a corporation's supplies and goods, and vehicles transporting its employees, use local roads.  Corporations call upon local police and fire departments to protect their facilities. Corporations rely on local schools to educate prospective employees, and the availability of good schools and other government services are features that may aid a corporation in attracting and retaining employees.  Thus, disparate treatment of corporate and personal income cannot be justified based on the state services enjoyed by these two groups of taxpayers.

The sole remaining attribute that, in the view of petitioner, distinguishes a corporation from an individual for present purposes is the right of the individual to vote.  The principal dissent also emphasizes that residents can vote to change Maryland's discriminatory tax law.  *Post*, at 3–4.

The argument is that this Court need not be concerned about state laws that burden the interstate activities of individuals because those individuals can lobby and vote against legislators who support such measures. But if a State's tax unconstitutionally discriminates against interstate commerce, it is invalid regardless of whether the plaintiff is a resident voter or nonresident of the State. This Court has thus entertained and even sustained dormant Commerce Clause challenges by individual residents of the State that imposed the alleged burden on interstate commerce, *Department of Revenue of Ky.* v. *Davis*, 553 U. S. 328, 336 (2008); *Granholm* v. *Heald*, 544 U. S. 460, 469 (2005), and we have also sustained such a challenge to a tax whose burden was borne by in-state consumers, *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263, 272 (1984).[3]

The principal dissent and JUSTICE SCALIA respond to these holdings by relying on dictum in *Goldberg* v. *Sweet*, 488 U. S. 252, 266 (1989), that it is not the purpose of the dormant Commerce Clause "'to protect state residents from their own state taxes.'" *Post*, at 3 (GINSBURG, J., dissenting); *post,* at 5 (SCALIA, J., dissenting). But we repudiated that dictum in *West Lynn Creamery, Inc.* v. *Healy,* 512 U. S. 186 (1994), where we stated that "[s]tate taxes are ordinarily paid by in-state businesses and consumers, yet if they discriminate against out-of-state products, they are unconstitutional." *Id.,* at 203. And, of course, the dictum must bow to the holdings of our many cases entertaining Commerce Clause challenges brought

---

[3] Similarly, we have sustained dormant Commerce Clause challenges by corporate residents of the State that imposed the burden on interstate commerce. See, *e.g., Camps Newfound/Owatonna, Inc.* v. *Town of Harrison*, 520 U. S. 564, 567 (1997); *Fulton Corp.* v. *Faulkner*, 516 U. S. 325, 328 (1996); *Central Greyhound Lines, Inc.* v. *Mealey*, 334 U. S. 653, 654 (1948); *Gwin, White & Prince, Inc.* v. *Henneford*, 305 U. S. 434, 435 (1939); *J. D. Adams Mfg. Co.* v. *Storen*, 304 U. S. 307, 308 (1938).

by residents. We find the dissents' reliance on *Goldberg*'s dictum particularly inappropriate since they do not find themselves similarly bound by the rule of that case, which applied the internal consistency test to determine whether the tax at issue violated the dormant Commerce Clause. 488 U. S., at 261.

In addition, the notion that the victims of such discrimination have a complete remedy at the polls is fanciful. It is likely that only a distinct minority of a State's residents earns income out of State. Schemes that discriminate against income earned in other States may be attractive to legislators and a majority of their constituents for precisely this reason. It is even more farfetched to suggest that natural persons with out-of-state income are better able to influence state lawmakers than large corporations headquartered in the State. In short, petitioner's argument would leave no security where the majority of voters prefer protectionism at the expense of the few who earn income interstate.

It would be particularly incongruous in the present case to disregard our prior decisions regarding the taxation of corporate income because the income at issue here is a type of corporate income, namely, the income of a Subchapter S corporation. Only small businesses may incorporate under Subchapter S, and thus acceptance of petitioner's submission would provide greater protection for income earned by large Subchapter C corporations than small businesses incorporated under Subchapter S.

## D

In attempting to justify Maryland's unusual tax scheme, the principal dissent argues that the Commerce Clause imposes no limit on Maryland's ability to tax the income of its residents, no matter where that income is earned. It argues that Maryland has the sovereign power to tax all of the income of its residents, wherever earned, and it there-

fore reasons that the dormant Commerce Clause cannot constrain Maryland's ability to expose its residents (and nonresidents) to the threat of double taxation.

This argument confuses what a State may do without violating the Due Process Clause of the Fourteenth Amendment with what it may do without violating the Commerce Clause. The Due Process Clause allows a State to tax "*all* the income of its residents, even income earned outside the taxing jurisdiction." *Oklahoma Tax Comm'n* v. *Chickasaw Nation*, 515 U. S. 450, 462–463 (1995). But "while a State may, consistent with the Due Process Clause, have the authority to tax a particular taxpayer, imposition of the tax may nonetheless violate the Commerce Clause." *Quill Corp.* v. *North Dakota*, 504 U. S. 298, 305 (1992) (rejecting a due process challenge to a tax before sustaining a Commerce Clause challenge to that tax).

Our decision in *Camps Newfound* illustrates the point. There, we held that the Commerce Clause prohibited Maine from granting more favorable tax treatment to charities that operated principally for the benefit of Maine residents. 520 U. S., at 580–583. Because the plaintiff charity in that case was a Maine nonprofit corporation, there is no question that Maine had the raw jurisdictional power to tax the charity. See *Chickasaw Nation*, *supra*, at 462–463. Nonetheless, the tax failed scrutiny under the Commerce Clause. *Camps Newfound*, *supra*, at 580–581. Similarly, Maryland's raw power to tax its residents' out-of-state income does not insulate its tax scheme from scrutiny under the dormant Commerce Clause.

Although the principal dissent claims the mantle of precedent, it is unable to identify a single case that endorses its essential premise, namely, that the Commerce Clause places no constraint on a State's power to tax the income of its residents wherever earned. This is unsurprising. As cases like *Quill Corp.* and *Camps Newfound*

recognize, the fact that a State has the jurisdictional power to impose a tax says nothing about whether that tax violates the Commerce Clause. See also, *e.g., Barclays Bank PLC* v. *Franchise Tax Bd. of Cal.*, 512 U. S. 298 (1994) (separately addressing due process and Commerce Clause challenges to a tax); *Moorman*, 437 U. S. 267 (same); *Standard Pressed Steel Co.* v. *Department of Revenue of Wash.*, 419 U. S. 560 (1975) (same); *Lawrence* v. *State Tax Comm'n of Miss.*, 286 U. S. 276 (1932) (separately addressing due process and equal protection challenges to a tax); *Travis* v. *Yale & Towne Mfg. Co.*, 252 U. S. 60 (1920) (separately addressing due process and privileges-and-immunities challenges to a tax).

One good reason why we have never accepted the principal dissent's logic is that it would lead to plainly untenable results. Imagine that Maryland taxed the income that its residents earned in other States but exempted income earned out of State from any business that primarily served Maryland residents. Such a tax would violate the dormant Commerce Clause, see *Camps Newfound*, *supra*, and it cannot be saved by the principal dissent's admonition that Maryland has the power to tax all the income of its residents. There is no principled difference between that hypothetical Commerce Clause challenge and this one.

The principal dissent, if accepted, would work a sea change in our Commerce Clause jurisprudence. Legion are the cases in which we have considered and even upheld dormant Commerce Clause challenges brought by residents to taxes that the State had the jurisdictional power to impose. See, *e.g., Davis*, 553 U. S. 328; *Camps Newfound*, 520 U. S. 564; *Fulton Corp.*, 516 U. S. 325; *Bacchus Imports*, 468 U. S. 263; *Central Greyhound*, 334 U. S. 653; *Gwin, White*, 305 U. S. 434; *J. D. Adams*, 304 U. S. 307. If the principal dissent were to prevail, all of these cases would be thrown into doubt. After all, in those

cases, as here, the State's decision to tax in a way that allegedly discriminates against interstate commerce could be justified by the argument that a State may tax its residents without any Commerce Clause constraints.

### E

While the principal dissent claims that we are departing from principles that have been accepted for "a century" and have been "repeatedly acknowledged by this Court," see *post*, at 1, 2, 19, when it comes to providing supporting authority for this assertion, it cites exactly two Commerce Clause decisions that are supposedly inconsistent with our decision today. One is a summary affirmance, *West Publishing Co.* v. *McColgan*, 328 U. S. 823 (1946), and neither actually supports the principal dissent's argument.

In the first of these cases, *Shaffer* v. *Carter*, 252 U. S. 37, a resident of Illinois who earned income from oil in Oklahoma unsuccessfully argued that his Oklahoma income tax assessment violated several provisions of the Federal Constitution. His main argument was based on due process, but he also raised a dormant Commerce Clause challenge. Although the principal dissent relies on *Shaffer* for the proposition that a State may tax the income of its residents wherever earned, *Shaffer* did not reject the Commerce Clause challenge on that basis.

The dormant Commerce Clause challenge in *Shaffer* was nothing like the Wynnes' challenge here. The taxpayer in *Shaffer* argued that "[i]f the tax is considered an excise tax on business, rather than an income tax proper," it unconstitutionally burdened interstate commerce. Brief for Appellant, O. T. 1919, No. 531, p. 166. The taxpayer did not argue that this burden occurred because he was subject to double taxation; instead, he argued that the tax was an impermissible direct "tax on interstate business." *Ibid.* That argument was based on the notion that States may not impose a tax "directly" on interstate commerce.

See *supra,* at 8–9. After assuming that the taxpayer's business was engaged in interstate commerce, we held that "it is sufficient to say that the tax is imposed not upon the gross receipts, but only upon the net proceeds, and is plainly sustainable, even if it includes net gains from interstate commerce. [*United States Glue Co.* v. *Town of Oak Creek*], 247 U. S. 321." *Shaffer*, *supra*, at 57 (citation omitted).

*Shaffer* thus did not adjudicate anything like the double taxation argument that was accepted in later cases and is before us today. And the principal dissent's suggestion that *Shaffer* allows States to levy discriminatory net income taxes is refuted by a case decided that same day. In *Travis*, a Connecticut corporation challenged New York's net income tax, which allowed residents, but not nonresidents, certain tax exemptions. The Court first rejected the taxpayer's due process argument as "settled by our decision in *Shaffer*." 252 U. S., at 75. But that due process inquiry was not the end of the matter: the Court then separately considered—and sustained—the argument that the net income tax's disparate treatment of residents and nonresidents violated the Privileges and Immunities Clause. *Id.,* at 79–80.

The second case on which the principal dissent relies, *West Publishing*, is a summary affirmance and thus has "considerably less precedential value than an opinion on the merits." *Illinois Bd. of Elections* v. *Socialist Workers Party*, 440 U. S. 173, 180–181 (1979). A summary affirmance "'is not to be read as a renunciation by this Court of doctrines previously announced in our opinions after full argument.'" *Mandel* v. *Bradley*, 432 U. S. 173, 176 (1977) (*per curiam*) (quoting *Fusari* v. *Steinberg*, 419 U. S. 379, 392 (1975) (Burger, C. J., concurring)). The principal dissent's reliance on the state-court decision below in that case is particularly inappropriate because "a summary affirmance is an affirmance of the judgment only," and

"the rationale of the affirmance may not be gleaned solely from the opinion below." 432 U. S., at 176.

Moreover, we do not disagree with the result of *West Publishing*. The tax in that case was levied only on "'the net income of every corporation derived *from sources within this State*,'" and thus was an internally consistent and nondiscriminatory tax scheme. See *West Publishing Co.* v. *McColgan*, 27 Cal. 2d 705, 707, n., 166 P. 2d 861, 862, n. (1946) (emphasis added). Moreover, even if we did disagree with the result, the citation in our summary affirmance to *United States Glue Co.* suggests that our decision was based on the since-discarded distinction between net income and gross receipts taxes. *West Publishing* did not—indeed, it could not—repudiate the double taxation cases upon which we rely.

The principal dissent also finds it significant that, when States first enacted modern income taxes in the early 1900's, some States had tax schemes similar to Maryland's. This practice, however, was by no means universal. A great many States—such as Alabama, Colorado, Georgia, Kentucky, and Maryland—had early income tax schemes that allowed their residents a credit against taxes paid to other States. See Ala. Code, Tit. 51, ch. 17, §390 (1940); Colo. Stat. Ann., ch. 84A, §38 (Cum. Supp. 1951); Ga. Code Ann. §92–3111 (1974); Carroll's Ky. Stat. Ann., ch. 108, Art. XX, §4281b–15 (Baldwin rev. 1936); Md. Ann. Code, Art. 81, ch. 277, §231 (1939). Other States also adopted internally consistent tax schemes. For example, Massachusetts and Utah taxed only the income of residents, not nonresidents. See Mass. Gen. Laws, ch. 62 (1932); Utah Rev. Stat. §80–14–1 *et seq.* (1933).

In any event, it is hardly surprising that these early state ventures into the taxation of income included some protectionist regimes that favored the local economy over interstate commerce. What is much more significant is that over the next century, as our Commerce Clause juris-

prudence developed, the States have almost entirely abandoned that approach, perhaps in recognition of their doubtful constitutionality. Today, the near-universal state practice is to provide credits against personal income taxes for such taxes paid to other States. See 2 J. Hellerstein & W. Hellerstein, State Taxation, ¶20.10, pp. 20–163 to 20– 164 (3d ed. 2003).[4]

### F

### 1

As previously noted, the tax schemes held to be unconstitutional in *J. D. Adams*, *Gwin, White*, and *Central Greyhound*, had the potential to result in the discriminatory double taxation of income earned out of state and created a powerful incentive to engage in intrastate rather than interstate economic activity. Although we did not use the term in those cases, we held that those schemes could be cured by taxes that satisfy what we have subsequently labeled the "internal consistency" test. See *Jefferson Lines*, 514 U. S., at 185 (citing *Gwin, White* as a case requiring internal consistency); see also 1 Trost §2:19, at 122–123, and n. 160 (explaining that the internal consistency test has its origins in *Western Live Stock*, *J. D. Adams*, and *Gwin, White*). This test, which helps courts identify tax schemes that discriminate against interstate commerce, "looks to the structure of the tax at issue to see whether its identical application by every State in the Union would place interstate commerce at a disadvantage

_____

[4] There is no merit to petitioner's argument that Maryland is free to adopt any tax scheme that is not actually intended to discriminate against interstate commerce. Reply Brief 7. The Commerce Clause regulates effects, not motives, and it does not require courts to inquire into voters' or legislators' reasons for enacting a law that has a discriminatory effect. See, *e.g.*, *Associated Industries of Mo.* v. *Lohman*, 511 U. S. 641, 653 (1994); *Philadelphia* v. *New Jersey*, 437 U. S. 617, 626– 627 (1978); *Hunt* v. *Washington State Apple Advertising Comm'n*, 432 U. S. 333, 352–353 (1977).

as compared with commerce intrastate." 514 U. S., at 185. See also, *e.g., Tyler Pipe*, 483 U. S., at 246–248; *Armco*, 467 U. S., at 644–645; *Container Corp. of America* v. *Franchise Tax Bd.*, 463 U. S. 159, 169 (1983).

By hypothetically assuming that every State has the same tax structure, the internal consistency test allows courts to isolate the effect of a defendant State's tax scheme. This is a virtue of the test because it allows courts to distinguish between (1) tax schemes that inherently discriminate against interstate commerce without regard to the tax policies of other States, and (2) tax schemes that create disparate incentives to engage in interstate commerce (and sometimes result in double taxation) only as a result of the interaction of two different but nondiscriminatory and internally consistent schemes. See *Armco, supra*, at 645–646; *Moorman*, 437 U. S., at 277, n. 12; Brief for Tax Economists as *Amici Curiae* 23–24 (hereinafter Brief for Tax Economists); Brief for Michael S. Knoll & Ruth Mason as *Amici Curiae* 18–23 (hereinafter Brief for Knoll & Mason). The first category of taxes is typically unconstitutional; the second is not.[5] See *Armco, supra*, at 644–646; *Moorman, supra*, at 277, and n. 12. Tax schemes that fail the internal consistency test will fall into the first category, not the second: "[A]ny cross-border tax disadvantage that remains after application of the [test] cannot be due to tax disparities"[6] but is instead attributable to the taxing State's discriminatory policies alone.

--------

[5] Our cases have held that tax schemes may be invalid under the dormant Commerce Clause even absent a showing of actual double taxation. *Mobil Oil Corp.* v. *Commissioner of Taxes of Vt.*, 445 U. S. 425, 444 (1980); *Gwin, White*, 305 U. S., at 439. We note, however, that petitioner does not dispute that respondents have been subject to actual multiple taxation in this case.

[6] Mason, Made in America for European Tax: The Internal Consistency Test, 49 Boston College L. Rev. 1277, 1310 (2008).

Neither petitioner nor the principal dissent questions the economic bona fides of the internal consistency test. And despite its professed adherence to precedent, the principal dissent ignores the numerous cases in which we have applied the internal consistency test in the past. The internal consistency test was formally introduced more than three decades ago, see *Container Corp.*, *supra*, and it has been invoked in no fewer than seven cases, invalidating the tax in three of those cases. See *American Trucking Assns., Inc.* v. *Michigan Pub. Serv. Comm'n*, 545 U. S. 429 (2005);[7] *Jefferson Lines, Inc.*, 514 U. S. 175; *Goldberg*, 488

———————

[7] The principal dissent and JUSTICE SCALIA inaccurately state that the Court in *American Trucking* "conceded that a trucking tax 'fail[ed] the "internal consistency" test,' but upheld the tax anyway." *Post*, at 5 (SCALIA, J., dissenting); see also *post*, at 14–15 (GINSBURG, J., dissenting). The Court did not say that the tax in question "failed the 'internal consistency test.'" The Court wrote that this is what *petitioner argued*. See *American Trucking*, 545 U. S., at 437. And the Court did not concede that this was true. The tax in that case was a flat tax on any truck that made point-to-point deliveries in Michigan. The tax therefore fell on all trucks that made solely intrastate deliveries and some that made interstate deliveries, namely, those that also made some intrastate deliveries. What the Court "concede[d]" was that "if all States [adopted a similar tax], an interstate truck would have to pay fees totaling several hundred dollars, or even several thousand dollars, *were it to 'top off' its business by carrying local loads in many (or even all) other States*." *Id.,* at 438 (emphasis added). But that was not the same as a concession that the tax violated the internal consistency test.

The internal consistency test asks whether the adoption of a rule by all States "would place interstate commerce at a disadvantage as compared with commerce intrastate." *Oklahoma Tax Comm'n* v. *Jefferson Lines, Inc.*, 514 U. S. 175, 185 (1995). Whether the Michigan trucking tax had such an effect depended on an empirical showing that petitioners failed to make, namely, that the challenged tax imposed a heavier burden on interstate truckers in general than it did on intrastate truckers. Under the Michigan tax, some interstate truckers, *i.e.,* those who used Michigan roads solely for trips that started and ended outside the State, did not pay this tax even though they benefited from the use of the State's roads; they were thus treated more favorably than truckers who did not leave the State. Other truckers who made inter-

U. S. 252; *American Trucking Assns., Inc.* v. *Scheiner*, 483 U. S. 266 (1987); *Tyler Pipe*, 483 U. S. 232; *Armco*, 467 U. S. 638; *Container Corp.*, *supra*.

2

Maryland's income tax scheme fails the internal consistency test.[8] A simple example illustrates the point. Assume that every State imposed the following taxes, which are similar to Maryland's "county" and "special nonresident" taxes: (1) a 1.25% tax on income that residents earn in State, (2) a 1.25% tax on income that residents earn in other jurisdictions, and (3) a 1.25% tax on income that nonresidents earn in State. Assume further that two taxpayers, April and Bob, both live in State A, but that April earns her income in State A whereas Bob earns his income in State B. In this circumstance, Bob

———————

state trips, *i.e.,* those who made some intrastate trips, were treated less favorably. As the United States explained in its brief, "[n]either record evidence nor abstract logic makes clear whether the overall effect of such a system would be to increase or to reduce existing financial disincentives to interstate travel." Brief for United States in *American Trucking Assns., Inc.* v. *Michigan Pub. Serv. Comm'n*, O. T. 2004, No. 03–1230, p. 26.

[8]In order to apply the internal consistency test in this case, we must evaluate the Maryland income tax scheme as a whole. That scheme taxes three separate categories of income: (1) the "county tax" on income that Maryland residents earn in Maryland; (2) the "county tax" on income that Maryland residents earn in other States; and (3) the "special nonresident tax" on income that nonresidents earn in Maryland. For Commerce Clause purposes, it is immaterial that Maryland assigns different labels (*i.e.*, "county tax" and "special nonresident tax") to these taxes. In applying the dormant Commerce Clause, they must be considered as one. Cf. *Oregon Waste Systems, Inc.* v. *Department of Environmental Quality of Ore.*, 511 U. S. 93, 102–103 (1994) (independent taxes on intrastate and interstate commerce are "compensatory" if they are rough equivalents imposed upon substantially similar events). If state labels controlled, a State would always be free to tax domestic, inbound, and outbound income at discriminatory rates simply by attaching different labels.

will pay more income tax than April solely because he earns income interstate.  Specifically, April will have to pay a 1.25% tax only once, to State A.  But Bob will have to pay a 1.25% tax twice: once to State A, where he resides, and once to State B, where he earns the income.

Critically—and this dispels a central argument made by petitioner and the principal dissent—the Maryland scheme's discriminatory treatment of interstate commerce is not simply the result of its interaction with the taxing schemes of other States.  Instead, the internal consistency test reveals what the undisputed economic analysis shows: Maryland's tax scheme is inherently discriminatory and operates as a tariff.  See Brief for Tax Economists 4, 9; Brief for Knoll & Mason 2.  This identity between Maryland's tax and a tariff is fatal because tariffs are "[t]he paradigmatic example of a law discriminating against interstate commerce."  *West Lynn*, 512 U. S., at 193.  Indeed, when asked about the foregoing analysis made by *amici* Tax Economists and Knoll & Mason, counsel for Maryland responded, "I don't dispute the mathematics. They lose me when they switch from tariffs to income taxes."  Tr. of Oral Arg. 9.  But Maryland has offered no reason why our analysis should change because we deal with an income tax rather than a formal tariff, and we see none.  After all, "tariffs against the products of other States are so patently unconstitutional that our cases reveal not a single attempt by any State to enact one. Instead, the cases are filled with state laws that aspire to reap some of the benefits of tariffs by other means." *West Lynn*, *supra*, at 193.

None of our dissenting colleagues dispute this economic analysis.  The principal dissent focuses instead on a supposed "oddity" with our analysis: The principal dissent can envision other tax schemes that result in double taxation but do not violate the internal consistency test.  This would happen, the principal dissent points out, if State A

taxed only based on residence and State B taxed only based on source. *Post*, at 17 (GINSBURG, J., dissenting); see also *post*, at 7 (SCALIA, J., dissenting). Our prior decisions have already considered and rejected this precise argument—and for good reason. For example, in *Armco*, we struck down an internally inconsistent tax that posed a risk of double taxation even though we recognized that there might be other permissible arrangements that would result in double taxation. Such schemes would be constitutional, we explained, because "such a result would not arise from impermissible discrimination against interstate commerce." 467 U. S., at 645. The principal dissent's protest that our distinction is "entirely circular," *post*, at 17–18, n. 10, misunderstands the critical distinction, recognized in cases like *Armco*, between discriminatory tax schemes and double taxation that results only from the interaction of two different but nondiscriminatory tax schemes. See also *Moorman*, 437 U. S., at 277, n. 12 (distinguishing "the potential consequences of the use of different formulas by the two States," which is not prohibited by the Commerce Clause, from discrimination that "inhere[s] in either State's formula," which is prohibited).

Petitioner and the Solicitor General argue that Maryland's tax is neutral, not discriminatory, because the same tax applies to all three categories of income. Specifically, they point out that the same tax is levied on (1) residents who earn income in State, (2) residents who earn income out of State, and (3) nonresidents who earn income in State. But the fact that the tax might have "'the advantage of appearing nondiscriminatory' does not save it from invalidation." *Tyler Pipe*, 483 U. S., at 248 (quoting *General Motors Corp.* v. *Washington*, 377 U. S. 436, 460 (1964) (Goldberg, J., dissenting)). See also *American Trucking Assns., Inc.* v. *Scheiner*, 483 U. S. at, 281 (dormant Commerce Clause applies to state taxes even when they "do not allocate tax burdens between insiders

and outsiders in a manner that is facially discriminatory"); *Maine* v. *Taylor*, 477 U. S. 131, 138 (1986) (a state law may discriminate against interstate commerce "'either on its face or in practical effect'" (quoting *Hughes*, 441 U. S., at 336)). In this case, the internal consistency test and economic analysis—indeed, petitioner's own concession— confirm that the tax scheme operates as a tariff and discriminates against interstate commerce, and so the scheme is invalid.

Petitioner and the principal dissent, *post*, at 6, also note that by offering residents who earn income in interstate commerce a credit against the "state" portion of the income tax, Maryland actually receives less tax revenue from residents who earn income from interstate commerce rather than intrastate commerce. This argument is a red herring. The critical point is that the total tax burden on interstate commerce is higher, not that Maryland may receive more or less tax revenue from a particular taxpayer. See *Armco*, *supra*, at 642–645. Maryland's tax unconstitutionally discriminates against interstate commerce, and it is thus invalid regardless of how much a particular taxpayer must pay to the taxing State.

Once again, a simple hypothetical illustrates the point. Assume that State A imposes a 5% tax on the income that its residents earn in-state but a 10% tax on income they earn in other jurisdictions. Assume also that State A happens to grant a credit against income taxes paid to other States. Such a scheme discriminates against interstate commerce because it taxes income earned interstate at a higher rate than income earned intrastate. This is so despite the fact that, in certain circumstances, a resident of State A who earns income interstate may pay less tax to State A than a neighbor who earns income intrastate. For example, if Bob lives in State A but earns his income in State B, which has a 6% income tax rate, Bob would pay a total tax of 10% on his income, though 6% would go to

State B and (because of the credit) only 4% would go to
State A. Bob would thus pay less to State A than his
neighbor, April, who lives in State A and earns all of her
income there, because April would pay a 5% tax to State
A. But Bob's tax burden to State A is irrelevant; his total
tax burden is what matters.

The principal dissent is left with two arguments against
the internal consistency test. These arguments are incon-
sistent with each other and with our precedents.

First, the principal dissent claims that the analysis
outlined above requires a State taxing based on residence
to "recede" to a State taxing based on source. *Post*, at 1–2.
We establish no such rule of priority. To be sure, Mary-
land could remedy the infirmity in its tax scheme by offer-
ing, as most States do, a credit against income taxes paid
to other States. See *Tyler Pipe, supra*, at 245–246, and
n. 13. If it did, Maryland's tax scheme would survive the
internal consistency test and would not be inherently
discriminatory. Tweak our first hypothetical, *supra,* at
21–22, and assume that all States impose a 1.25% tax on
all three categories of income but also allow a credit
against income taxes that residents pay to other jurisdic-
tions. In that circumstance, April (who lives and works in
State A) and Bob (who lives in State A but works in State
B) would pay the same tax. Specifically, April would pay a
1.25% tax only once (to State A), and Bob would pay a
1.25% tax only once (to State B, because State A would
give him a credit against the tax he paid to State B).

But while Maryland could cure the problem with its
current system by granting a credit for taxes paid to other
States, we do not foreclose the possibility that it could
comply with the Commerce Clause in some other way. See
Brief for Tax Economists 32; Brief for Knoll & Mason 28–
30. Of course, we do not decide the constitutionality of a
hypothetical tax scheme that Maryland might adopt be-
cause such a scheme is not before us. That Maryland's

existing tax unconstitutionally discriminates against interstate commerce is enough to decide this case.

Second, the principal dissent finds a "deep flaw" with the possibility that "Maryland could eliminate the inconsistency [with its tax scheme] by terminating the special nonresident tax—a measure that would not help the Wynnes at all." *Post*, at 16. This second objection refutes the first. By positing that Maryland could remedy the unconstitutionality of its tax scheme by eliminating the special nonresident tax, the principal dissent accepts that Maryland's desire to tax based on residence need not "recede" to another State's desire to tax based on source.

Moreover, the principal dissent's supposed flaw is simply a truism about every case under the dormant Commerce Clause (not to mention the Equal Protection Clause): Whenever government impermissibly treats like cases differently, it can cure the violation by either "leveling up" or "leveling down." Whenever a State impermissibly taxes interstate commerce at a higher rate than intrastate commerce, that infirmity could be cured by lowering the higher rate, raising the lower rate, or a combination of the two. For this reason, we have concluded that "a State found to have imposed an impermissibly discriminatory tax retains flexibility in responding to this determination." *McKesson Corp.* v. *Division of Alcoholic Beverages and Tobacco, Fla. Dept. of Business Regulation*, 496 U. S. 18, 39–40 (1990). See also *Associated Industries of Mo.* v. *Lohman,* 511 U. S. 641, 656 (1994); *Fulton Corp.*, 516 U. S., at 346–347. If every claim that suffers from this "flaw" cannot succeed, no dormant Commerce Clause or equal protection claim could ever succeed.

## G

JUSTICE SCALIA would uphold the constitutionality of the Maryland tax scheme because the dormant Commerce Clause, in his words, is "a judicial fraud." *Post*, at 2. That

was not the view of the Court in *Gibbons* v. *Ogden*, 9 Wheat, at 209, where Chief Justice Marshall wrote that there was "great force" in the argument that the Commerce Clause by itself limits the power of the States to enact laws regulating interstate commerce. Since that time, this supposedly fraudulent doctrine has been applied in dozens of our opinions, joined by dozens of Justices. Perhaps for this reason, petitioner in this case, while challenging the interpretation and application of that doctrine by the court below, did not ask us to reconsider the doctrine's validity.

JUSTICE SCALIA does not dispute the fact that State tariffs were among the principal problems that led to the adoption of the Constitution. See *post*, at 3. Nor does he dispute the fact that the Maryland tax scheme is tantamount to a tariff on work done out of State. He argues, however, that the Constitution addresses the problem of state tariffs by prohibiting States from imposing "'Imposts or Duties on Imports or Exports.'" *Ibid.* (quoting Art. I, §10, cl. 2). But he does not explain why, under his interpretation of the Constitution, the Import-Export Clause would not lead to the same result that we reach under the dormant Commerce Clause. Our cases have noted the close relationship between the two provisions. See, *e.g., State Tonnage Tax Cases*, 12 Wall. 204, 214 (1871).

JUSTICE THOMAS also refuses to accept the dormant Commerce Clause doctrine, and he suggests that the Constitution was ratified on the understanding that it would not prevent a State from doing what Maryland has done here. He notes that some States imposed income taxes at the time of the adoption of the Constitution, and he observes that "[t]here is no indication that those early state income tax schemes provided credits for income taxes paid elsewhere." *Post*, at 2 (dissenting opinion). "It seems highly implausible," he writes, "that those who ratified the Commerce Clause understood it to conflict

with the income tax laws of their States and nonetheless adopted it without a word of concern." *Ibid.* This argument is plainly unsound.

First, because of the difficulty of interstate travel, the number of individuals who earned income out of State in 1787 was surely very small. (We are unaware of records showing, for example, that it was common in 1787 for workers to commute to Manhattan from New Jersey by rowboat or from Connecticut by stagecoach.)

Second, JUSTICE THOMAS has not shown that the small number of individuals who earned income out of State were taxed twice on that income. A number of Founding-era income tax schemes appear to have taxed only the income of residents, not nonresidents. For example, in his report to Congress on direct taxes, Oliver Wolcott, Jr., Secretary of Treasury, describes Delaware's income tax as being imposed only on "the inhabitants of this State," and he makes no mention of the taxation of nonresidents' income. Report to 4th Cong., 2d Sess. (1796), concerning Direct Taxes, in 1 American State Papers, Finance 429 (1832). JUSTICE THOMAS likewise understands that the Massachusetts and Delaware income taxes were imposed only on residents. *Post*, at 2, n. These tax schemes, of course, pass the internal consistency test. Moreover, the difficulty of administering an income tax on nonresidents would have diminished the likelihood of double taxation. See R. Blakey, State Income Taxation 1 (1930).

Third, even if some persons were taxed twice, it is unlikely that this was a matter of such common knowledge that it must have been known by the delegates to the State ratifying conventions who voted to adopt the Constitution.

\*    \*    \*

For these reasons, the judgment of the Court of Appeals of Maryland is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———

No. 13–485

———

## COMPTROLLER OF THE TREASURY OF MARYLAND, PETITIONER *v.* BRIAN WYNNE ET UX.

ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF MARYLAND

[May 18, 2015]

JUSTICE SCALIA, with whom JUSTICE THOMAS joins as to Parts I and II, dissenting.

The Court holds unconstitutional Maryland's refusal to give its residents full credits against income taxes paid to other States. It does this by invoking the negative Commerce Clause, a judge-invented rule under which judges may set aside state laws that they think impose too much of a burden upon interstate commerce. I join the principal dissent, which demonstrates the incompatibility of this decision with our prior negative Commerce Clause cases. *Post*, at 2–14 (opinion of GINSBURG, J.). Incompatibility, however, is not the test for me—though what is incompatible with our cases *a fortiori* fails my test as well, as discussed briefly in Part III below. The principal purpose of my writing separately is to point out how wrong our negative Commerce Clause jurisprudence is in the first place, and how well today's decision illustrates its error.

I

The fundamental problem with our negative Commerce Clause cases is that the Constitution does not contain a negative Commerce Clause. It contains only a Commerce Clause. Unlike the negative Commerce Clause adopted by the judges, the real Commerce Clause adopted by the People merely empowers Congress to "regulate Commerce

with foreign Nations, and among the several States, and with the Indian Tribes." Art. I, §8, cl. 3. The Clause says nothing about prohibiting state laws that burden commerce. Much less does it say anything about authorizing judges to set aside state laws *they believe* burden commerce. The clearest sign that the negative Commerce Clause is a judicial fraud is the utterly illogical holding that congressional consent enables States to enact laws that would otherwise constitute impermissible burdens upon interstate commerce. See *Prudential Ins. Co.* v. *Benjamin*, 328 U. S. 408, 421–427 (1946). How could congressional consent lift a constitutional prohibition? See *License Cases*, 5 How. 504, 580 (1847) (opinion of Taney, C. J.).

The Court's efforts to justify this judicial economic veto come to naught. The Court claims that the doctrine "has deep roots." *Ante,* at 5. So it does, like many weeds. But age alone does not make up for brazen invention. And the doctrine in any event is not quite as old as the Court makes it seem. The idea that the Commerce Clause of its own force limits state power "finds no expression" in discussions surrounding the Constitution's ratification. F. Frankfurter, The Commerce Clause Under Marshall, Taney and Waite 13 (1937). For years after the adoption of the Constitution, States continually made regulations that burdened interstate commerce (like pilotage laws and quarantine laws) without provoking any doubts about their constitutionality. *License Cases, supra,* at 580–581. This Court's earliest allusions to a negative Commerce Clause came only in dicta—ambiguous dicta, at that—and were vigorously contested at the time. See, *e.g., id.,* at 581–582. Our first clear *holding* setting aside a state law under the negative Commerce Clause came after the Civil War, more than 80 years after the Constitution's adoption. *Case of the State Freight Tax*, 15 Wall. 232 (1873). Since then, we have tended to revamp the doctrine every couple

of decades upon finding existing decisions unworkable or unsatisfactory. See *Quill Corp.* v. *North Dakota*, 504 U. S. 298, 309 (1992). The negative Commerce Clause applied today has little in common with the negative Commerce Clause of the 19th century, except perhaps for incoherence.

The Court adds that "tariffs and other laws that burdened interstate commerce" were among "the chief evils that led to the adoption of the Constitution." *Ante*, at 5. This line of reasoning forgets that interpretation requires heeding more than the Constitution's purposes; it requires heeding the means the Constitution uses to achieve those purposes. The Constitution addresses the evils of local impediments to commerce by prohibiting States from imposing certain especially burdensome taxes—"Imposts or Duties on Imports or Exports" and "Dut[ies] of Tonnage"—without congressional consent. Art. I, §10, cls. 2–3. It also addresses these evils by giving Congress a commerce power under which *it* may prohibit other burdensome taxes and laws. As the Constitution's text shows, however, it does not address these evils by empowering the *judiciary* to set aside state taxes and laws that *it* deems too burdensome. By arrogating this power anyway, our negative Commerce Clause cases have disrupted the balance the Constitution strikes between the goal of protecting commerce and competing goals like preserving local autonomy and promoting democratic responsibility.

## II

The failings of negative Commerce Clause doctrine go beyond its lack of a constitutional foundation, as today's decision well illustrates.

1. One glaring defect of the negative Commerce Clause is its lack of governing principle. Neither the Constitution nor our legal traditions offer guidance about how to sepa-

rate improper state interference with commerce from permissible state taxation or regulation of commerce. So we must make the rules up as we go along. That is how we ended up with the bestiary of ad hoc tests and ad hoc exceptions that we apply nowadays, including the substantial nexus test, the fair apportionment test, and the fair relation test, *Complete Auto Transit, Inc.* v. *Brady*, 430 U. S. 274, 279 (1977), the interest-on-state-bonds exception, *Department of Revenue of Ky.* v. *Davis*, 553 U. S. 328, 353–356 (2008), and the sales-taxes-on-mail-orders exception, *Quill Corp.*, *supra,* at 314–319.

The internal consistency rule invoked by the Court nicely showcases our ad hocery. Under this rule, a tax violates the Constitution if its hypothetical adoption by all States would interfere with interstate commerce. *Ante,* at 19. How did this exercise in counterfactuals find its way into our basic charter? The test, it is true, bears some resemblance to Kant's first formulation of the categorical imperative: "Act only according to that maxim whereby you can at the same time will that it should become a universal law" without contradiction. Grounding for the Metaphysics of Morals 30 (J. Ellington transl. 3d ed. 1993). It bears no resemblance, however, to anything in the text or structure of the Constitution. Nor can one discern an obligation of internal consistency from our legal traditions, which show that States have been imposing internally inconsistent taxes for quite a while—until recently with our approval. See, *e.g., General Motors Corp.* v. *Washington*, 377 U. S. 436 (1964) (upholding internally inconsistent business activities tax); *Hinson* v. *Lott*, 8 Wall. 148 (1869) (upholding internally inconsistent liquor tax). No, the only justification for the test seems to be that this Court disapproves of "'cross-border tax disadvantage[s]'" when created by internally inconsistent taxes, but is willing to tolerate them when created by "the interaction of . . . internally consistent schemes." *Ante,* at 19.

"Whatever it is we are expounding in this area, it is not a Constitution." *American Trucking Assns., Inc.* v. *Smith*, 496 U. S. 167, 203 (1990) (SCALIA, J., concurring in judgment).

2. Another conspicuous feature of the negative Commerce Clause is its instability. Because no principle anchors our development of this doctrine—and because the line between wise regulation and burdensome interference changes from age to economic age—one can never tell when the Court will make up a new rule or throw away an old one. "Change is almost [the doctrine's] natural state, as it is the natural state of legislation in a constantly changing national economy." *Ibid.*

Today's decision continues in this proud tradition. Consider a few ways in which it contradicts earlier decisions:

- In an earlier case, the Court conceded that a trucking tax "fail[ed] the 'internal consistency' test," but upheld the tax anyway. *American Trucking Assns., Inc.* v. *Michigan Pub. Serv. Comm'n*, 545 U. S. 429, 437 (2005). Now, the Court proclaims that an income tax "fails the internal consistency test," and for that reason strikes it down. *Ante,* at 21.

- In an earlier case, the Court concluded that "[i]t is not a purpose of the Commerce Clause to protect state residents from their own state taxes" and that residents could "complain about and change the tax through the [State's] political process." *Goldberg* v. *Sweet*, 488 U. S. 252, 266 (1989). Now, the Court concludes that the negative Commerce Clause operates "regardless of whether the plaintiff is a resident . . . or nonresident" and that "the notion that [residents] have a complete remedy at the polls is fanciful." *Ante,* at 11, 12.

- In an earlier case, the Court said that "[t]he difference in effect between a tax measured by gross receipts and one measured by net income . . . is manifest and substantial." *United States Glue Co.* v. *Town of Oak Creek*, 247 U. S. 321, 328 (1918). Now, the Court says that the "formal distinction" between taxes on net and gross income "should [not] matter." *Ante*, at 7.

- In an earlier case, the Court upheld a tax despite its economic similarity to the gross-receipts tax struck down in *Central Greyhound Lines, Inc.* v. *Mealey*, 334 U. S. 653 (1948). *Oklahoma Tax Comm'n* v. *Jefferson Lines, Inc.*, 514 U. S. 175, 190–191 (1995). The Court explained that "economic equivalence alone has . . . not been (and should not be) the touchstone of Commerce Clause jurisprudence." *Id.,* at 196–197, n. 7. Now, the Court strikes down a tax in part because of its economic similarity to the gross-receipts tax struck down in *Central Greyhound*. *Ante,* at 7. The Court explains that "we must consider 'not the formal language of the tax statute but rather its practical effect.'" *Ante,* at 7–8.

So much for internal consistency.

3. A final defect of our Synthetic Commerce Clause cases is their incompatibility with the judicial role. The doctrine does not call upon us to perform a conventional judicial function, like interpreting a legal text, discerning a legal tradition, or even applying a stable body of precedents. It instead requires us to balance the needs of commerce against the needs of state governments. That is a task for legislators, not judges.

Today's enterprise of eliminating double taxation puts this problem prominently on display. The one sure way to eliminate all double taxation is to prescribe uniform national tax rules—for example, to allow taxation of income

only where earned. But a program of prescribing a national tax code plainly exceeds the judicial competence. (It may even exceed the legislative competence to come up with a uniform code that accounts for the many political and economic differences among the States.) As an alternative, we could consider whether a State's taxes in practice overlap too much with the taxes of other States. But any such approach would drive us "to the perplexing inquiry, so unfit for the judicial department, what degree of taxation is the legitimate use, and what degree may amount to an abuse of power." *McCulloch* v. *Maryland*, 4 Wheat. 316, 430 (1819). The Court today chooses a third approach, prohibiting States from imposing internally inconsistent taxes. *Ante,* at 19. But that rule avoids double taxation only in the hypothetical world where all States adopt the same internally consistent tax, not in the real world where different States might adopt different internally consistent taxes. For example, if Maryland imposes its income tax on people who live in Maryland regardless of where they work (one internally consistent scheme), while Virginia imposes its income tax on people who work in Virginia regardless of where they live (another internally consistent scheme), Marylanders who work in Virginia *still* face double taxation. *Post,* at 17–18. Then again, it is only fitting that the Imaginary Commerce Clause would lead to imaginary benefits.

## III

For reasons of *stare decisis*, I will vote to set aside a tax under the negative Commerce Clause if (but only if) it discriminates on its face against interstate commerce or cannot be distinguished from a tax this Court has already held unconstitutional. *American Trucking Assns.*, 545 U. S., at 439 (SCALIA, J., concurring in judgment). The income tax before us does not discriminate on its face against interstate commerce; a resident pays no less to

Maryland when he works in Maryland than when he works elsewhere. Neither is the tax before us indistinguishable from one that we have previously held unconstitutional. To the contrary, as the principal dissent establishes, our prior cases validate this tax.

\*     \*     \*

Maryland's refusal to give residents full tax credits against income taxes paid to other States has its disadvantages. It threatens double taxation and encourages residents to work in Maryland. But Maryland's law also has its advantages. It allows the State to collect equal revenue from taxpayers with equal incomes, avoids the administrative burdens of verifying tax payments to other States, and ensures that every resident pays the State at least some income tax. Nothing in the Constitution precludes Maryland from deciding that the benefits of its tax scheme are worth the costs.

I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

———

No. 13–485

———

## COMPTROLLER OF THE TREASURY OF MARYLAND, PETITIONER *v.* BRIAN WYNNE ET UX.

### ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF MARYLAND

[May 18, 2015]

JUSTICE THOMAS, with whom JUSTICE SCALIA joins except as to the first paragraph, dissenting.

"I continue to adhere to my view that the negative Commerce Clause has no basis in the text of the Constitution, makes little sense, and has proved virtually unworkable in application, and, consequently, cannot serve as a basis for striking down a state statute." *McBurney* v. *Young*, 569 U. S. \_\_\_, \_\_\_ (2013) (THOMAS, J., concurring) (slip op., at 1) (internal quotation marks and alteration omitted); accord, *e.g., Camps Newfound/Owatonna, Inc.* v. *Town of Harrison*, 520 U. S. 564, 610–612 (1997) (THOMAS, J., dissenting). For that reason, I would uphold Maryland's tax scheme.

In reaching the contrary conclusion, the Court proves just how far our negative Commerce Clause jurisprudence has departed from the actual Commerce Clause. According to the majority, a state income tax that fails to provide residents with "a full credit against the income taxes that they pay to other States" violates the Commerce Clause. *Ante,* at 1. That news would have come as a surprise to those who penned and ratified the Constitution. As this Court observed some time ago, "Income taxes . . . were imposed by several of the States at or shortly after the adoption of the Federal Constitution." *Shaffer* v. *Carter*,

252 U. S. 37, 51 (1920).*  There is no indication that those early state income tax schemes provided credits for income taxes paid elsewhere.  Thus, under the majority's reasoning, all of those state laws would have contravened the newly ratified Commerce Clause.

It seems highly implausible that those who ratified the Commerce Clause understood it to conflict with the income tax laws of their States and nonetheless adopted it without a word of concern.  That silence is particularly deafening given the importance of such taxes for raising revenues at the time.  See Kinsman, The Income Tax in the Commonwealths of the United States 7, in 4 Publications of the American Economic Assn. (1903) (noting, for example, that "Connecticut from her earliest history had followed the plan of taxing incomes rather than property" and that "[t]he total assessed value of [taxable] incomes in Connecticut in the year 1795 was a little over $300,000" (internal quotation marks omitted)).

In other areas of constitutional analysis, we would have considered these laws to be powerful evidence of the original understanding of the Constitution.  We have, for ex-

––––––––––

*See, *e.g.,* 1777–1778 Mass. Acts ch. 13, §2, p. 756 (taxing "the amount of [inhabitants'] income from any profession, faculty, handicraft, trade or employment; and also on the amount of all incomes and profits gained by trading by sea and on shore"); 1781 Pa. Laws ch. 961, §12, p. 390 (providing that "[a]ll offices and posts of profit, trades, occupations and professions (that of ministers of the gospel of all denominations and schoolmasters only excepted), shall be rated at the discretion of the township, ward or district assessors . . . having due regard of the profits arising from them"); see also Report of Oliver Wolcott, Jr., Secretary of the Treasury, to 4th Cong., 2d Sess., concerning Direct Taxes (1796), in 1 American State Papers, Finance 414, 423 (1832) (describing Connecticut's income tax as assessing, as relevant, "the estimated gains or profits arising from any, and all, lucrative professions, trades, and occupations"); *id.,* at 429 (noting that, in Delaware, "[t]axes have been hitherto collected on the estimated annual income of the inhabitants of this State, without reference to specific objects").

ample, relied on the practices of the First Congress to guide our interpretation of provisions defining congressional power. See, *e.g., Golan* v. *Holder*, 565 U. S. \_\_\_, \_\_\_ (2012) (slip op., at 16) (Copyright Clause); *McCulloch* v. *Maryland*, 4 Wheat. 316, 401–402 (1819) (Necessary and Proper Clause). We have likewise treated "actions taken by the First Congress a[s] presumptively consistent with the Bill of Rights," *Town of Greece* v. *Galloway*, 572 U. S. \_\_\_, \_\_\_ (2014) (ALITO, J., concurring) (slip op., at 12). See, *e.g., id.,* at \_\_\_ – \_\_\_ (majority opinion) (slip op., at 7–8); *Carroll* v. *United States*, 267 U. S. 132, 150–152 (1925). And we have looked to founding-era state laws to guide our understanding of the Constitution's meaning. See, *e.g., District of Columbia* v. *Heller*, 554 U. S. 570, 600–602 (2008) (Second Amendment); *Atwater* v. *Lago Vista*, 532 U. S. 318, 337–340 (2001) (Fourth Amendment); *Roth* v. *United States*, 354 U. S. 476, 482–483 (1957) (First Amendment); *Kilbourn* v. *Thompson*, 103 U. S. 168, 202–203 (1881) (Speech and Debate Clause); see also *Calder* v. *Bull*, 3 Dall. 386, 396–397 (1798) (opinion of Paterson, J.) (Ex Post Facto Clause).

Even if one assumed that the negative Commerce Clause existed, I see no reason why it would be subject to a different mode of constitutional interpretation. The majority quibbles that I fail to "sho[w] that the small number of individuals who earned income out of State were taxed twice on that income," *ante,* at 28, but given the deference we owe to the duly enacted laws of a State—particularly those concerning the paradigmatically sovereign activity of taxation—the burden of proof falls on those who would wield the Federal Constitution to foreclose that exercise of sovereign power.

I am doubtful that the majority's application of one of our many negative Commerce Clause tests is correct under our precedents, see *ante,* at 5–7 (SCALIA, J., dissenting); *post,* at 10–19 (GINSBURG, J., dissenting), but I am

certain that the majority's result is incorrect under our Constitution.  As was well said in another area of constitutional law: "[I]f there is any inconsistency between [our] tests and the historic practice . . . , the inconsistency calls into question the validity of the test, not the historic practice."  *Town of Greece, supra,* at ___ (ALITO, J., concurring) (slip op., at 12).

I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

———————

No. 13–485

———————

## COMPTROLLER OF THE TREASURY OF MARYLAND, PETITIONER *v.* BRIAN WYNNE ET UX.

### ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF MARYLAND

[May 18, 2015]

JUSTICE GINSBURG, with whom JUSTICE SCALIA and JUSTICE KAGAN join, dissenting.

Today's decision veers from a principle of interstate and international taxation repeatedly acknowledged by this Court: A nation or State "may tax *all* the income of its residents, even income earned outside the taxing jurisdiction." *Oklahoma Tax Comm'n* v. *Chickasaw Nation*, 515 U. S. 450, 462–463 (1995). In accord with this principle, the Court has regularly rejected claims that taxes on a resident's out-of-state income violate the Due Process Clause for lack of a sufficient "connection" to the taxing State. *Quill Corp.* v. *North Dakota*, 504 U. S. 298, 306 (1992) (internal quotation marks omitted); see, *e.g., Lawrence* v. *State Tax Comm'n of Miss.*, 286 U. S. 276, 281 (1932). But under dormant Commerce Clause jurisprudence, the Court decides, a State is not really empowered to tax a resident's income from whatever source derived. In taxing personal income, the Court holds, source-based authority, *i.e.,* authority to tax commerce conducted within a State's territory, boxes in the taxing authority of a taxpayer's domicile.

As I see it, nothing in the Constitution or in prior decisions of this Court dictates that one of two States, the domiciliary State or the source State, must recede simply because both have lawful tax regimes reaching the same

income.   See *Moorman Mfg. Co.* v. *Bair*, 437 U. S. 267, 277, n. 12 (1978) (finding no "discriminat[ion] against interstate commerce" where alleged taxation disparities were "the consequence of the combined effect" of two otherwise lawful income-tax schemes).   True, Maryland elected to deny a credit for income taxes paid to other States in computing a resident's county tax liability.   It is equally true, however, that the other States that taxed the Wynnes' income elected not to offer them a credit for their Maryland county income taxes.   In this situation, the Constitution does not prefer one lawful basis for state taxation of a person's income over the other.   Nor does it require one State, in this case Maryland, to limit its residence-based taxation, should the State also choose to exercise, to the full extent, its source-based authority. States often offer their residents credits for income taxes paid to other States, as Maryland does for state income tax purposes.   States do so, however, as a matter of tax "policy," *Chickasaw Nation*, 515 U. S., at 463, n. 12 (internal quotation marks omitted), not because the Constitution compels that course.

I

For at least a century, "domicile" has been recognized as a secure ground for taxation of residents' worldwide income.   *Lawrence*, 286 U. S., at 279.   "Enjoyment of the privileges of residence within [a] state, and the attendant right to invoke the protection of its laws," this Court has explained, "are inseparable from the responsibility for sharing the costs of government."   *Ibid.*   "A tax measured by the net income of residents is an equitable method of distributing the burdens of government among those who are privileged to enjoy its benefits."   *New York ex rel. Cohn* v. *Graves*, 300 U. S. 308, 313 (1937).

More is given to the residents of a State than to those who reside elsewhere, therefore more may be demanded of

them. With this Court's approbation, States have long favored their residents over nonresidents in the provision of local services. See *Reeves, Inc.* v. *Stake*, 447 U. S. 429, 442 (1980) (such favoritism does not violate the Commerce Clause). See also *Martinez* v. *Bynum*, 461 U. S. 321 (1983) (upholding residency requirements for free primary and secondary schooling). The cost of services residents enjoy is substantial. According to the State's Comptroller, for example, in 2012 Maryland and its local governments spent over $11 billion to fund public schools, $4 billion for state health programs, and $1.1 billion for the State's food supplemental program—all programs available to residents only. Brief for Petitioner 20–23. See also Brief for United States as *Amicus Curiae* 18 (Howard County— where the Wynnes lived in 2006—budgeted more than $903 million for education in fiscal year 2014). Excluding nonresidents from these services, this Court has observed, is rational for it is residents "who fund the state treasury and whom the State was created to serve." *Reeves*, 447 U. S., at 442. A taxpayer's home State, then, can hardly be faulted for making support of local government activities an obligation of every resident, regardless of any obligations residents may have to *other* States.[1]

Residents, moreover, possess political means, not shared by outsiders, to ensure that the power to tax their income is not abused. "It is not," this Court has observed, "a purpose of the Commerce Clause to protect state residents from their own state taxes." *Goldberg* v. *Sweet*, 488 U. S. 252, 266 (1989). The reason is evident. Residents are

_____

[1] The Court offers no response to this reason for permitting a State to tax its residents' worldwide income, other than to urge that Commerce Clause doctrine ought not favor corporations over individuals. See *ante,* at 10–11. I scarcely disagree with that proposition (nor does this opinion suggest otherwise). But I fail to see how it answers, or is even relevant to, my observation that affording residents greater benefits entitles a State to require that they bear a greater tax burden.

"insider[s] who presumably [are] able to complain about and change the tax through the [State's] political process." *Ibid.* Nonresidents, by contrast, are not similarly positioned to "effec[t] legislative change." *Ibid.* As Chief Justice Marshall, developer of the Court's Commerce Clause jurisprudence, reasoned: "In imposing a tax the legislature acts upon its constituents. This is in general a sufficient security against erroneous and oppressive taxation." *McCulloch* v. *Maryland*, 4 Wheat. 316, 428 (1819). The "people of a State" can thus "res[t] confidently on the interest of the legislator, and on the influence of the constituents over their representative, to guard them against . . . abuse" of the "right of taxing themselves and their property." *Ibid.*[2]

I hardly maintain, as the majority insistently asserts I do, that "the Commerce Clause places no constraint on a State's power to tax" its residents. *Ante,* at 13. See also *ante,* at 11–15. This Court has not shied away from striking down or closely scrutinizing state efforts to tax residents at a higher rate for out-of-state activities than for in-state activities (or to exempt from taxation only in-state activities). See, *e.g., Department of Revenue of Ky.* v. *Davis*, 553 U. S. 328, 336 (2008); *Camps Newfound/ Owatonna, Inc.* v. *Town of Harrison*, 520 U. S. 564

---

[2] The majority dismisses what we said in *Goldberg* v. *Sweet*, 488 U. S. 252 (1989), as "dictum" allegedly "repudiated" by the Court in *West Lynn Creamery, Inc.* v. *Healy*, 512 U. S. 186, 203 (1994). *Ante,* at 11–12. That is doubly wrong. In *Goldberg*, we distinguished the tax struck down in *American Trucking Assns., Inc.* v. *Scheiner*, 483 U. S. 266 (1987) (*ATA I*), noting, in particular, that the tax in *ATA I* fell on "out-of-state[rs]" whereas the tax in *Goldberg* fell on "the insider who presumably is able to complain about and change the tax through the Illinois political process." 488 U. S., at 266. Essential to our holding, this rationale cannot be written off as "dictum." As for *West Lynn Creamery*, far from "repudiat[ing]" *Goldberg*, the Court *cited Goldberg* and *reaffirmed* its political safeguards rationale, as explained below. See *infra* this page and 5.

(1997); *Fulton Corp.* v. *Faulkner*, 516 U. S. 325 (1996); *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263, 272 (1984). See also *ante,* at 11, and n. 3, 14–15 (mistakenly charging that under my analysis "all of these cases would be thrown into doubt"). "[P]olitical processes" are ill equipped to guard against such facially discriminatory taxes because the effect of a tax of this sort is to "mollif[y]" some of the "in-state interests [that] would otherwise lobby against" it. *West Lynn Creamery, Inc.* v. *Healy*, 512 U. S. 186, 200 (1994). By contrast, the Court has generally upheld "even-handed tax[es] . . . in spite of any adverse effects on interstate commerce, in part because '[t]he existence of major in-state interests adversely affected . . . is a power-ful safeguard against legislative abuse.'" *Ibid.* (citing, *inter alia, Goldberg*, 488 U. S., at 266). That justification applies with full force to the "evenhanded tax" challenged here, which taxes residents' income at the same rate whether earned in-state or out-of-state.[3]

These rationales for a State taxing its residents' world-wide income are not diminished by another State's inde-pendent interest in "requiring contributions from [nonres-idents] who realize current pecuniary benefits under the protection of the [State's] government." *Shaffer* v. *Carter*, 252 U. S. 37, 51 (1920). A taxpayer living in one State and working in another gains protection and benefits from both—and so can be called upon to share in the costs of

———————

[3] Given the pedigree of this rationale, applying it here would hardly "work a sea change in our Commerce Clause jurisprudence." *Ante,* at 14. See *United Haulers Assn., Inc.* v. *Oneida-Herkimer Solid Waste Management Authority*, 550 U. S. 330, 345, n. 7 (2007); *Goldberg*, 488 U. S., at 266; *Minnesota* v. *Clover Leaf Creamery Co.*, 449 U. S. 456, 473, n. 17 (1981); *Raymond Motor Transp., Inc.* v. *Rice*, 434 U. S. 429, 444, n. 18 (1978); *South Carolina Highway Dept.* v. *Barnwell Brothers, Inc.*, 303 U. S. 177, 187 (1938). Nor would applying the rationale to a net income tax cast "doubt" on the Court's gross receipts precedents, *ante,* at 14–15, given the Court's longstanding practice of evaluating income and gross receipt taxes differently, see *infra*, at 12–14.

both States' governments.

States deciding whether to tax residents' entire world-wide income must choose between legitimate but competing tax policy objectives. A State might prioritize obtaining equal contributions from those who benefit from the State's protection in roughly similar ways. Or a State might prioritize ensuring that its taxpayers are not subject to double taxation. A State cannot, however, accomplish both objectives at once.

To illustrate, consider the Wynnes. Under the tax scheme in place in 2006, other Howard County residents who earned their income in-state but who otherwise had the same tax profile as the Wynnes (*e.g.,* $2.67 million in taxable net income) owed the same amount of taxes *to Maryland* as the Wynnes. See App. to Pet. for Cert. A–56. The scheme thus ensured that all residents with similar access to the State's protection and benefits and similar ability to pay made equal contributions to the State to defray the costs of those benefits. Maryland could not achieve that objective, however, without exposing the Wynnes to a risk of double taxation. Conversely, the Court prioritizes reducing the risk that the Wynnes' income will be taxed twice by two different States. But that choice comes at a cost: The Wynnes enjoyed equal access to the State's services but will have paid $25,000 less to cover the costs of those services than similarly situated neighbors who earned their income entirely within the State. See Pet. for Cert. 15.

States confront the same trade-off when deciding whether to tax nonresidents' entire in-state income. A State can require all residents and nonresidents who work within the State under its protection to contribute equally to the cost of that protection. Or the State can seek to avoid exposing its workers to any risk of double taxation. But it cannot achieve both objectives.

For at least a century, responsibility for striking the

right balance between these two policy objectives has belonged to the States (and Congress), not this Court. Some States have chosen the same balance the Court embraces today. See *ante,* at 17. But since almost the dawn of the modern era of state income taxation, other States have taken the same approach as Maryland does now, taxing residents' entire income, wherever earned, while at the same time taxing nonresidents' entire in-state income. And recognizing that "[p]rotection, benefit, and power over [a taxpayer's income] are not confined to either" the State of residence or the State in which income is earned, this Court has long afforded States that flexibility. *Curry* v. *McCanless*, 307 U. S. 357, 368 (1939). This history of States imposing and this Court upholding income tax schemes materially identical to the one the Court confronts here should be the beginning and end of this case.

The modern era of state income taxation dates from a Wisconsin tax enacted in 1911. See 1911 Wis. Laws ch. 658; R. Blakey, State Income Taxation 1 (1930). From close to the start of this modern era, States have taxed residents and nonresidents in ways materially indistinguishable from the way Maryland does now. In 1915, for example, Oklahoma began taxing residents' "entire net income . . . arising or accruing from *all* sources," while at the same time taxing nonresidents' "entire net income from [sources] in th[e] State." 1915 Okla. Sess. Laws ch. 164, §1, pp. 232–233 (emphasis added). Like Maryland today, Oklahoma provided no credit to either residents or nonresidents for taxes paid elsewhere. See *id.*, ch. 164, §1 *et seq.*, at 232–237. In 1917, neighboring Missouri adopted a similar scheme: Residents owed taxes on their "entire net income . . . from *all* sources" and nonresidents owed taxes on their "entire net income . . . from all sources within th[e] state." 1917 Mo. Laws §1(a), pp. 524–525 (emphasis added). Missouri too provided neither residents nor nonresidents a credit for taxes paid to other jurisdic-

tions. See *id.*, §1 *et seq.*, at 524–538. Thus, much like Maryland today, these early income tax adopters simultaneously taxed residents on *all* income, wherever earned, and nonresidents on *all* income earned within the State.[4]

Almost immediately, this Court began issuing what became a long series of decisions, repeatedly upholding States' authority to tax both residents' worldwide income and nonresidents' in-state income. *E.g., Maguire* v. *Trefry*, 253 U. S. 12, 17 (1920) (resident income tax); *Shaffer*, 252 U. S., at 52–53, 57 (nonresident income tax). See also *State Tax Comm'n of Utah* v. *Aldrich*, 316 U. S. 174, 178 (1942); *Curry*, 307 U. S., at 368; *Guaranty Trust Co.* v. *Virginia*, 305 U. S. 19, 23 (1938); *Graves*, 300 U. S., at 313; *Lawrence*, 286 U. S., at 281. By the end of the 20th century, it was "a well-established principle of interstate and international taxation" that "sovereigns have authority to tax all income of their residents, including income earned outside their borders," *Chickasaw Nation*, 515 U. S., at 462, 463, n. 12, and that sovereigns generally may also tax nonresidents on "income earned within the [sovereign's] jurisdiction," *id.,* at 463, n. 11.

Far from suggesting that States must choose between taxing residents or nonresidents, this Court specifically affirmed that the exact same "income may be taxed [simultaneously] *both* by the state where it is earned *and* by the state of the recipient's domicile." *Curry*, 307 U. S., at

––––––––

[4] Unlike Maryland's county income tax, these early 20th-century income taxes allowed a deduction for taxes paid to other jurisdictions. Compare App. 18 with 1917 Mo. Laws §5, pp. 526–527, and 1915 Okla. Sess. Laws §6, p. 234. The Wynnes have not argued and the majority does not suggest, however, that Maryland could fully cure the asserted defects in its tax "scheme" simply by providing a deduction, in lieu of a tax credit. And I doubt that such a deduction would give the Wynnes much satisfaction: Deducting taxes paid to other States from the Wynnes' $2.67 million taxable net income would reduce their Maryland tax burden by a small fraction of the $25,000 tax credit the majority awards them. See Pet. for Cert. 15; App. to Pet. for Cert. A–56.

368 (emphasis added). See also *Aldrich*, 316 U. S., at 176–178, 181 (rejecting "a rule of immunity from taxation by more than one state," including with respect to income taxation (internal quotation marks omitted)). In *Lawrence*, for example, this Court dealt with a Mississippi tax "scheme" with the same structure Maryland has today: Mississippi taxed residents on all income, wherever earned, and nonresidents on income earned within the State, without providing either set of taxpayers a credit for taxes paid elsewhere. See 286 U. S., at 278–279; Miss. Code Ann. §5033(a), (b)(9) (1930). *Lawrence* upheld a Mississippi tax on net income earned by one of its residents on the construction of public highways in Tennessee. See 286 U. S., at 279–281. The Court did so fully aware that both Mississippi and Tennessee were effectively imposing "an income tax upon the same occupation." Reply Brief in *Lawrence* v. *State Tax Comm'n of Miss.*, O. T. 1931, No. 580, p. 32. See also *Curry*, 307 U. S., at 363, n. 1, 368 (discussing *Lawrence*).

Likewise, in *Guaranty Trust*, both New York and Virginia had taxed income of a New York trust that had been distributed to a Virginia resident. 305 U. S., at 21–22. The resident sought to block Virginia's tax in order to avoid "double taxation" of the "identical income." *Id.*, at 22. Rejecting that challenge, the Court once again reiterated that "two States" may simultaneously tax the "same income." *Ibid.*

The majority deems these cases irrelevant because they involved challenges brought under the Due Process Clause, not the Commerce Clause. See *ante,* at 12–15. These cases are significant, however, not because the constraints imposed by the two Clauses are identical. Obviously, they are not. See *Quill Corp.*, 504 U. S., at 305. What the sheer volume and consistency of this precedent confirms, rather, is the degree to which this Court has—until now—endorsed the "well-established principle of

interstate and international taxation" that a State may tax its residents' worldwide income, without restriction arising from the source-based taxes imposed by other States and regardless of whether the State also chooses to impose source-based taxes of its own. *Chickasaw Nation*, 515 U. S., at 462.[5]

In any event, it is incorrect that support for this principle is limited to the Court's Due Process Clause cases. In *Shaffer*, for example, this Court rejected *both* a Due Process Clause challenge *and* a dormant Commerce Clause challenge to an income tax "scheme" (the Oklahoma statute described above) with the very features the majority latches onto today: Oklahoma taxed residents on all worldwide income and nonresidents on all in-state income, without providing a credit for taxes paid elsewhere to either residents or nonresidents. 252 U. S., at 52–53 (Due Process challenge); *id.,* at 57 (dormant Commerce Clause challenge). See also *supra*, at 7. The specific tax challenged in *Shaffer*—a tax on a nonresident's in-state income—exposed taxpayers to the same risk of double taxation as the Maryland tax challenged in this case. The majority labors mightily to distinguish *Shaffer*, but it does not dispute the one thing that ought to give it pause: Today's decision overrules *Shaffer*'s dormant Commerce Clause holding. See *ante,* at 15–16. I would not discard our precedents so lightly. Just as the tax in *Shaffer* encountered no constitutional shoals, so Maryland's scheme should survive the Court's inspection.

–––––––––––

[5] Upholding Maryland's facially neutral tax hardly means, as the majority contends, *ante,* at 12, that the dormant Commerce Clause places no limits on States' authority to tax residents' worldwide income. There are, for example, no well-established principles of interstate and international taxation permitting the kind of facially discriminatory tax the majority "[i]magine[s]" a State enacting. *Ibid.* Nor are the political processes noted above an adequate safeguard against such a tax. See *supra,* at 3–5.

This Court's decision in *West Publishing Co.* v. *McColgan*, 328 U. S. 823 (1946), reinforces that conclusion. In *West Publishing*, the Court summarily affirmed a decision of the California Supreme Court that denied a dormant Commerce Clause challenge based on the principles today's majority disrespects:

> "[T]here [is no] merit to the contention that [California's tax] discriminates against interstate commerce on the ground that it subjects part of plaintiff's income to double taxation, given the taxability of plaintiff's entire net income in the state of its domicile. Taxation in one state is not an immunization against taxation in other states. Taxation by states in which a corporation carries on business activities is justified by the advantages that attend the pursuit of such activities. Income may be taxed both by the state where it is earned and by the state of the recipient's domicile. Protection, benefit and power over the subject matter are not confined to either state." 27 Cal. 2d 705, 710–711, 166 P. 2d 861, 864 (1946) (citations and internal quotation marks omitted).

In treating the matter summarily, the Court rejected an argument strikingly similar to the one the majority now embraces: that California's tax violated the dormant Commerce Clause because it subjected "interstate commerce . . . to the risk of a double tax burden." Brief for Appellant Opposing Motion to Dismiss or Affirm in *West Publishing Co.* v. *McColgan*, O. T. 1945, No. 1255, pp. 20–21 (quoting *J. D. Adams Mfg. Co.* v. *Storen*, 304 U. S. 307, 311 (1938)).

The long history just recounted counsels in favor of respecting States' authority to tax without discount its residents' worldwide income. As Justice Holmes stated over a century ago, in regard to a "mode of taxation . . . of long standing, . . . the fact that the system has been in

force for a very long time is of itself a strong reason . . . for leaving any improvement that may be desired to the legislature." *Paddell* v. *City of New York*, 211 U. S. 446, 448 (1908). Only recently, this Court followed that sound advice in resisting a dormant Commerce Clause challenge to a taxing practice with a pedigree as enduring as the practice in this case. See *Department of Revenue of Ky.* v. *Davis*, 553 U. S. 328, 356–357 (2008) (quoting *Padell*, 211 U. S., at 448). Surely that advice merits application here, where the challenged tax draws support from both historical practice and numerous decisions of this Court.

The majority rejects Justice Holmes' counsel, observing that most States, over time, have chosen not to exercise plenary authority to tax residents' worldwide income. See *ante,* at 17–18. The Court, however, learns the wrong lesson from the "independent *policy* decision[s]" States have made. *Chickasaw*, 515 U. S., at 463, n. 12 (emphasis added; internal quotation marks omitted). This history demonstrates not that States "doub[t]" their "constitutiona[l]" authority to tax residents' income, wherever earned, as the majority speculates, *ante,* at 18, but that the very political processes the Court disregards as "fanciful," *ante,* at 12, have in fact worked to produce policies the Court ranks as responsible—all the more reason to resist this Court's heavy-handed supervision.

The Court also attempts to deflect the force of this history and precedent by relying on a "trilogy" of decisions it finds "particularly instructive." *Ante,* at 6–7 (citing *Central Greyhound Lines, Inc.* v. *Mealey*, 334 U. S. 653 (1948); *Gwin, White & Prince, Inc.* v. *Henneford*, 305 U. S. 434 (1939); *J. D. Adams Mfg.*, 304 U. S. 307). As the majority acknowledges, however, those three decisions involved gross receipts taxes, not income taxes. *Ante,* at 7–9. True, this Court has recently pointed to similarities between these two forms of taxation. See *ante,* at 9. But it is an indulgence in wishful thinking to say that this Court has

previously "rejected the argument that the Commerce Clause distinguishes between" these taxes. *Ante*, at 9. For decades—including the years when the majority's "trilogy" was decided—the Court has routinely maintained that "the difference between taxes on net income and taxes on gross receipts from interstate commerce warrants different results" under the Commerce Clause. C. Trost & P. Hartman, Federal Limitations on State and Local Taxation 2d §10:1 (2003).

In *Shaffer*, for example, the Court rejected the taxpayer's dormant Commerce Clause challenge *because* "the tax [was] imposed not upon gross receipts . . . but only upon the net proceeds." 252 U. S., at 57. Just three years before deciding *J. D. Adams*, the Court emphasized "manifest and substantial" differences between the two types of taxes, calling the burden imposed by a gross receipts tax "direct and immediate," in contrast to the "indirect and incidental" burden imposed by an income tax. *Stewart Dry Goods Co.* v. *Lewis*, 294 U. S. 550, 558 (1935) (quoting *United States Glue Co.* v. *Town of Oak Creek*, 247 U. S. 321, 328 (1918)). And the *Gwin, White* opinion observed that invalidating the gross receipts tax at issue "left to the states wide scope for taxation of those engaged in interstate commerce, extending to . . . *net income derived from it.*" 305 U. S., at 441 (emphasis added).

The majority asserts that this Court "rejected" this distinction in *Moorman Mfg.* See *ante,* at 9. That decision in fact described gross receipts taxes as "more burdensome" than income taxes—twice. 437 U. S., at 280, 281. In particular, *Moorman* upheld a state income tax because an earlier decision had upheld a similar but "inherently more burdensome" gross receipts tax. *Id.,* at 281. To say that the constitutionality of an income tax follows *a fortiori* from the constitutionality of a similar but "more burdensome" gross receipts tax is to *affirm*, not reject, a distinction between the two.

The Justices participating in the Court's "trilogy," in short, would scarcely expect to see the three decisions invoked to invalidate a tax on net income.

## II

Abandoning principles and precedent sustaining simultaneous residence- and source-based income taxation, the Court offers two reasons for striking down Maryland's county income tax: (1) the tax creates a risk of double taxation, *ante,* at 7, 18; and (2) the Court deems Maryland's income tax "scheme" "inherently discriminatory"— by which the Court means, the scheme fails the so-called "internal consistency" test, *ante,* at 21–22. The first objection is overwhelmed by the history, recounted above, of States imposing and this Court upholding income taxes that carried a similar risk of double taxation. See *supra,* at 6–12. The Court's reliance on the internal consistency test is no more compelling.

This Court has not rigidly required States to maintain internally consistent tax regimes. Before today, for two decades, the Court has not insisted that a tax under review pass the internal consistency test, see *Oklahoma Tax Comm'n* v. *Jefferson Lines, Inc.*, 514 U. S. 175, 185 (1995), and has not struck down a state tax for failing the test in nearly 30 years, see *American Trucking Assns., Inc.* v. *Scheiner*, 483 U. S. 266, 284–287 (1987) (*ATA I*); *Tyler Pipe Industries, Inc.* v. *Washington State Dept. of Revenue*, 483 U. S. 232, 247–248 (1987). Moreover, the Court has rejected challenges to taxes that flunk the test. The Oklahoma tax "scheme" upheld under the dormant Commerce Clause in *Shaffer*, for example, is materially indistinguishable from—therefore as internally inconsistent as— Maryland's scheme. 252 U. S., at 57. And more recently, in *American Trucking Assns., Inc.* v. *Michigan Pub. Serv. Comm'n*, the Court upheld a "concede[dly]" internally inconsistent state tax. 545 U. S. 429, 438 (2005) (*ATA II*).

The Court did so, satisfied that there was a sufficiently close connection between the tax at issue and the local conduct that triggered the tax. See *ibid.*[6]

The logic of *ATA II*, counsel for the Wynnes appeared to recognize, see Tr. of Oral Arg. 46–47, would permit a State to impose a head tax—*i.e.,* a flat charge imposed on every resident in the State—even if that tax were part of an internally inconsistent tax scheme. Such a tax would rest on purely local conduct: the taxpayer's residence in the taxing State. And the taxes paid would defray costs closely connected to that local conduct—the services used by the taxpayer while living in the State.

I see no reason why the Constitution requires us to disarm States from using a progressive tax, rather than a flat toll, to cover the costs of local services all residents enjoy. A head tax and a residence-based income tax differ, do they not, only in that the latter is measured by each taxpayer's ability to pay. Like the head tax, however, a residence-based income tax is triggered by the purely local conduct of residing in the State. And also like the head tax, a residence-based income tax covers costs closely

————————

[6] The majority reads *American Trucking Assns., Inc.* v. *Michigan Pub. Serv. Comm'n*, 545 U. S. 429 (2005) (*ATA II*), in a way so implausible, it must resort to quoting from an *amicus* brief, rather than from the Court's opinion. According to the majority, this Court did *not* think the challenged tax failed the internal consistency test in *ATA II*, it held only that the challengers had failed to make the necessary "empirical showing." See *ante,* at 20–21, n. 7. It is true that the United States made that argument. See Brief for United States as *Amicus Curiae* in *ATA II*, O. T. 2004, No. 03–1230, p. 26. But one searches the U. S. Reports in vain for any indication that the Court adopted it. Which is hardly surprising, for one would scarcely think that a test turning on "*hypothetically*" assessing a tax's "structure," *ante,* at 19 (emphasis added), would require empirical data. What the Court in fact said in *ATA II*, is that the tax's internal inconsistency would be *excused* because any multiple taxation resulting from every State adopting the challenged tax would be caused by interstate firms' choosing to "engag[e] in *local* business in all those States." 545 U. S., at 438.

connected to that residence: It finances services used by those living in the State. If a head tax qualifies for *ATA II*'s reprieve from internal consistency, then so too must a residence-based income tax.

The majority asserts that because Maryland's tax scheme is internally inconsistent, it "operates as a tariff," making it "'patently unconstitutional.'" *Ante,* at 22. This is a curious claim. The defining characteristic of a tariff is that it taxes interstate activity at a higher rate than it taxes the same activity conducted within the State. See *West Lynn Creamery*, 512 U. S., at 193. Maryland's resident income tax does the exact opposite: It taxes the income of its residents at precisely the same rate, whether the income is earned in-state or out-of-state.[7]

There is, moreover, a deep flaw in the Court's chosen test. The Court characterizes internal consistency as a "cure," *ante,* at 18, 25–26, but the test is scarcely that, at least for the double taxation the Court believes to justify its intervention. According to the Court, Maryland's tax "scheme" is internally inconsistent because Maryland simultaneously imposes two taxes: the county income tax and the special nonresident tax. See *ante,* at 7, 21–22, and n. 8. But only one of these taxes—the county income tax—actually falls on the Wynnes. Because it is the interaction between these two taxes that renders Maryland's tax scheme internally inconsistent, Maryland could eliminate the inconsistency by terminating the special nonresident tax—a measure that would not help the Wynnes at all.[8] Maryland could, in other words, bring itself into compliance with the test at the heart of the Court's analysis without removing the double tax burden the test is pur-

—————

[7] The majority faults the dissents for not "disput[ing]" its "economic analysis," but beyond citation to a pair of *amicus* briefs, its opinion offers no analysis to dispute. *Ante,* at 22.

[8] Or Maryland could provide nonresidents a credit for taxes paid to other jurisdictions on Maryland source income. Cf. *ante,* at 25–26.

portedly designed to "cure."

To illustrate this oddity, consider the Court's "simple example" of April (who lives and works in State A) and Bob (who lives in State A, but works in State B). *Ante,* at 21–22, 25. Both States fail the internal consistency test because they impose (1) a 1.25% tax on income that residents earn in-state, (2) a 1.25% tax on income that residents earn in other jurisdictions, and (3) a 1.25% tax on income that nonresidents earn in-state. According to the Court, these tax schemes are troubling because "Bob will pay more income tax than April solely because he earns income interstate." *Ante,* at 22.

Each State, however, need not pursue the same approach to make their tax schemes internally consistent.[9] See *ante,* at 25–26. State A might choose to tax residents' worldwide income only, which it could do by eliminating tax #3 (on nonresidents' in-state income). State B might instead choose exclusively to tax income earned within the State by deleting tax #2 (on residents' out-of-state income). Each State's tax scheme would then be internally consistent. But the tax burden on April and Bob would remain unchanged: Just as under the original schemes, April would have to pay a 1.25% tax only once, to State A, and Bob would have to pay a 1.25% tax twice: once to State A, where he resides, and once to State B, where he earns the income. The Court's "cure," in other words, is no match for the perceived disease.[10]

––––––––

[9] I do not "clai[m]" as the Court groundlessly suggests, that the Court's analysis "establish[es] . . . [a] rule of priority" between residence- and source-based taxation. *Ante,* at 25–26. My objection, rather, is that the Court treats source-based authority as "box[ing] in" a State's discrete authority to tax on the basis of residence. *Supra,* at 1. There is no "inconsisten[cy]" in my analysis, and the majority plainly errs in insisting that there is. *Ante,* at 25.

[10] Attempting to preserve the test's qualification as a "cure," the Court redefines the illness as not just double taxation but double taxation caused by an "inherently discriminat[ory]" tax "scheme." *Ante,*

The Court asserts that this flaw is just a "truism" of every discrimination case, whether brought under the dormant Commerce Clause or the Equal Protection Clause. *Ante,* at 26. That is simply incorrect. As the Court acknowledges, a government that impermissibly "treats like cases differently" (*i.e.,* discriminates) can ordinarily cure the violation either by "leveling up" or "leveling down." *Ibid.* (internal quotation marks omitted). Consider another April and Bob example. If Bob must pay a 10% tax and April must pay a 5% tax, that discrimination can be eliminated either by requiring both to pay the 10% tax ("leveling up") *or* by requiring both to pay the 5% tax ("leveling down"). True, "leveling up" leaves Bob's tax bill unchanged. "Leveling up" nonetheless benefits Bob because it eliminates the unfairness of being treated differently. And if, as is often true in dormant Commerce Clause cases, April and Bob compete in the same market, then "leveling up" provides the concrete benefit of placing a new burden on Bob's competitors.

The majority's rule does not work this way. As just explained, Maryland can "cure" what the majority deems discrimination without lowering the Wynnes' taxes *or* increasing the tax burden on any of the Wynnes' neighbors—by terminating the special nonresident tax. See *supra,* at 16–17. The State can, in other words, satisfy the majority not by lowering Bob's taxes or by raising April's taxes, but by eliminating the taxes imposed on yet a third

---

at 19–20. Relying on such a distinction to justify the test is entirely circular, however, as the Court defines "inherent discrimination" in this case as internal inconsistency. In any event, given the concern that purportedly drives the Court's analysis, it is mystifying why the Court sees "virtue" in striking down only one of the two schemes under which Bob is taxed twice. *Ante,* at 19. Whatever disincentive the original scheme creates for Bob (or the Wynnes) to work in interstate commerce is created just as much by the revised scheme that the Court finds satisfactory.

taxpayer (say, Cathy). The Court's internal consistency test thus scarcely resembles "ordinary" anti-discrimination law. Whatever virtue the internal consistency test has in other contexts, this shortcoming makes it a poor excuse for jettisoning taxation principles as entrenched as those here.

*    *    *

This case is, at bottom, about policy choices: Should States prioritize ensuring that all who live or work within the State shoulder their fair share of the costs of government? Or must States prioritize avoidance of double taxation? As I have demonstrated, *supra,* at 16–19, achieving even the latter goal is beyond this Court's competence. Resolving the competing tax policy considerations this case implicates is something the Court is even less well equipped to do. For a century, we have recognized that state legislatures and the Congress are constitutionally assigned and institutionally better equipped to balance such issues. I would reverse, so that we may leave that task where it belongs.