**[J-5A-2023 and J-5B-2023] [MO: Todd, C.J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | | |
|---|---|---|
| DIANE ZILKA, | : | No. 20 EAP 2022 |
| | : | |
| Appellant | : | Appeal from the Order of |
| | : | Commonwealth Court entered on |
| | : | January 7, 2022, at No. 1063 CD |
| v. | : | 2019 affirming the Order entered on |
| | : | June 26, 2019, in the Court of |
| | : | Common Pleas, Philadelphia |
| TAX REVIEW BOARD CITY OF | : | County, Civil Division at Nos. 02438 |
| PHILADELPHIA, | : | and 02439, October Term 2018. |
| | : | |
| Appellee | : | ARGUED:  March 7, 2023 |
| | | |
| DIANE ZILKA, | : | No. 21 EAP 2022 |
| | : | |
| Appellant | : | Appeal from the Order of |
| | : | Commonwealth Court entered on |
| | : | January 7, 2022, at No. 1064 CD |
| v. | : | 2019 affirming the Order entered on |
| | : | June 26, 2019, in the Court of |
| | : | Common Pleas, Philadelphia |
| TAX REVIEW BOARD CITY OF | : | County, Civil Division at Nos. 02438 |
| PHILADELPHIA, | : | and 02439, October Term 2018. |
| | : | |
| Appellee | : | ARGUED:  March 7, 2023 |

## CONCURRING OPINION

**JUSTICE WECHT**                                                  **DECIDED: NOVEMBER 22, 2023**

I agree that the tax scheme before us passes the internal consistency test as applied in *Comptroller of the Treasury of Maryland v. Wynne*, 575 U.S. 542 (2015).  I write separately to explain that, while I discern some logical valence in Diane Zilka's novel legal argument, I am distinctly reluctant to expand upon the holding in *Wynne* given the protean

and unpredictable nature of the dormant Commerce Clause jurisprudence expounded by the Supreme Court of the United States.[1]

Article I Section 8 of the United States Constitution grants Congress the power to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."[2] This represents a positive conferral of power to Congress. In addition, the Supreme Court "consistently [has] held this language to contain a further, negative command, known as the dormant Commerce Clause, prohibiting certain state taxation even when Congress has failed to legislate on the subject."[3] This negative (or dormant) Commerce Clause aims to prevent "a State from retreating into economic isolation or jeopardizing the welfare of the Nation as a whole, as it would do if it were free to place burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear."[4] The doctrine "'reflect[s] a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation.'"[5]

By the Supreme Court's own admission, though, the dormant Commerce Clause's "command has been stated more easily than its object has been attained," leading the

---

[1]    In this opinion, my discussion of "the Supreme Court" refers to the Supreme Court of the United States, and not to this Supreme Court or the Supreme Court of any state.

[2]    U.S. CONST. art. I, § 8, cl. 3.

[3]    *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995) (citations omitted).

[4]    *Id.* at 180.

[5]    *Id.* (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 325-26 (1979)).

Court to revamp the doctrine many times.[6]  Early in the history of the dormant Commerce Clause, "the Court held the view that interstate commerce was wholly immune from state taxation 'in any form[.]'"[7]  "This position gave way in time to a less uncompromising," if still "formal approach," in which the Court would allow some taxes on interstate commerce so long they were given the correct name.[8]  The Court eventually tired of this formal approach too, abandoning it in *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274 (1977), which marks the beginning of the Court's modern dormant Commerce Clause jurisprudence.

The *Complete Auto* Court upheld a Mississippi privilege tax as applied to a Michigan company that shipped automobiles to dealers in Mississippi.  The Court explained that:

> Appellant's attack is based solely on decisions of this Court holding that a tax on the "privilege" of engaging in an activity in the State may not be applied to an activity that is part of interstate commerce.  *See, e.g.*, *Spector Motor Service v. O'Connor*, 340 U.S. 602 (1951); *Freeman v. Hewit*, 329 U.S. 249 (1946).  This rule looks only to the fact that the incidence of the tax is the "privilege of doing business"; it deems irrelevant any consideration of the practical effect of the tax.  The rule reflects an underlying philosophy that interstate commerce should enjoy a sort of "free trade" immunity from state taxation.[9]

---

[6]     *Id.* (remarking that "the Court's understanding of the dormant Commerce Clause has taken some turns").

[7]     *Id.* (quoting *Leloup v. Port of Mobile*, 127 U.S. 640, 648 (1888), *overruled by Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175 (1995)).

[8]     *Id.* at 181 (recounting that "the Court would invalidate a state tax levied on gross receipts from interstate commerce, or upon the 'freight carried' in interstate commerce, but would allow a tax merely measured by gross receipts from interstate commerce as long as the tax was formally imposed upon franchises, or 'in lieu of all taxes upon [the taxpayer's] property[.]'" (internal citations omitted)); *Di Santo v. Pennsylvania*, 273 U.S. 34, 44 (1927) (Stone, J., dissenting) (calling the Court's formal approach "too mechanical, too uncertain in its application, and too remote from actualities, to be of value").

[9]     *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 278 (1977).

In upholding the Mississippi privilege tax, the *Complete Auto* Court stated: "We note again that no claim is made that the activity is not sufficiently connected to the State to justify a tax, or that the tax is not fairly related to benefits provided the taxpayer, or that the tax discriminates against interstate commerce, or that the tax is not fairly apportioned."[10] This has since become the controlling test to determine whether a state tax violates the dormant commerce clause. Under *Complete Auto*, a state tax can be levied on interstate commerce as long as the tax: (1) has a sufficient nexus with the state; (2) is fairly apportioned; (3) does not discriminate against interstate commerce; and (4) is related to services provided by the state.

Although it is often said that a tax is unconstitutional if it fails to meet any one prong of the *Complete Auto* test, the Supreme Court's recent precedent suggests that a levy that theoretically could result in double taxation nonetheless may be constitutional if it passes what is called the internal consistency test.[11] The Supreme Court has explained that:

> Internal consistency is preserved when the imposition of a tax identical to the one in question by every other State would add no burden to interstate commerce that intrastate commerce would not also bear. This test asks nothing about the degree of economic reality reflected by the tax, but simply looks to the structure of the tax at issue to see whether its identical application by every State in the Union would place interstate commerce at a disadvantage as compared with commerce intrastate. A failure of internal consistency shows as a matter of law that a State is attempting to take more than its fair share of taxes from the interstate transaction, since allowing

---

[10]    *Id.* at 287.

[11]    *Compare Zilka*, 2022 WL 67789, at *3 ("Failure to meet any one prong [of the *Complete Auto* test] renders the tax unconstitutional."), *with Wynne*, 575 U.S. at 561-62 ("[T]he tax schemes held to be unconstitutional in [prior cases] had the potential to result in the discriminatory double taxation of income earned out of state and created a powerful incentive to engage in intrastate rather than interstate economic activity. Although we did not use the term in those cases, we held that those schemes could be cured by taxes that satisfy what we have subsequently labeled the 'internal consistency' test.").

such a tax in one State would place interstate commerce at the mercy of those remaining States that might impose an identical tax.[12]

In arguing that the tax scheme at issue here violates the internal consistency test, Zilka relies on the Supreme Court's decision in *Wynne*. The Maryland tax scheme at issue in that case had two parts: a "state" income tax, which was set at a graduated rate, and a so-called "county" income tax, which was set at a rate that varied by county but was capped at 3.2%. In addition to these taxes, Maryland also taxed the income of nonresidents who worked in the state. This nonresident tax also had two parts. First, nonresidents paid the "state" income tax on all the income they earned from sources within Maryland. Second, nonresidents were required to pay a "special nonresident tax" in lieu of the "county" tax. The "special nonresident tax" was levied on income earned from sources within Maryland, and its rate was equal to the lowest county income tax rate set by any Maryland county.

Maryland residents who paid income tax to another jurisdiction for income earned in that jurisdiction were allowed a credit against the Maryland "state" tax, but not the "county" tax. Thus, part of the income that a Maryland resident earned outside of the State could be taxed twice.

The Wynnes were Maryland residents who earned pass-through income from a Subchapter S corporation that operated in thirty-nine states. When filing their Maryland income taxes, the Wynnes claimed a credit for the taxes they paid in other states. The Maryland State Comptroller of the Treasury allowed the Wynnes a credit against their "state" income tax, but not against their "county" tax.

The Supreme Court held that Maryland's tax scheme was unconstitutional, since a portion of the taxpayer's income tax burden (the "county" portion) could not be reduced

---

[12] *Jefferson Lines, Inc.*, 514 U.S. at 185.

by taxes paid in other jurisdictions. After applying the internal consistency test, the Court concluded that the "Maryland scheme's discriminatory treatment of interstate commerce is not simply the result of its interaction with the taxing schemes of other States. Instead, the internal consistency test reveals [that] Maryland's tax scheme is inherently discriminatory and operates as a tariff."[13] The Court illustrated proper application of the internal consistency test as follows:

> Assume that every State imposed the following taxes, which are similar to Maryland's "county" and "special nonresident" taxes: (1) a 1.25% tax on income that residents earn in State, (2) a 1.25% tax on income that residents earn in other jurisdictions, and (3) a 1.25% tax on income that nonresidents earn in State. Assume further that two taxpayers, April and Bob, both live in State A, but that April earns her income in State A whereas Bob earns his income in State B. In this circumstance, Bob will pay more income tax than April solely because he earns income interstate. Specifically, April will have to pay a 1.25% tax only once, to State A. But Bob will have to pay a 1.25% tax twice: once to State A, where he resides, and once to State B, where he earns the income.[14]

The Court then modified its hypothetical to illustrate how the tax scheme would satisfy the internal consistency test if it allowed credits.

> [A]ssume that all States impose a 1.25% tax on all three categories of income but also allow a credit against income taxes that residents pay to other jurisdictions. In that circumstance, April (who lives and works in State A) and Bob (who lives in State A but works in State B) would pay the same tax. Specifically, April would pay a 1.25% tax only once (to State A), and Bob would pay a 1.25% tax only once (to State B, because State A would give him a credit against the tax he paid to State B).[15]

---

[13] *Wynne,* 575 U.S. at 565.

[14] *Id.* at 567-68.

[15] *Id.* at 568.

Justice Antonin Scalia dissented in *Wynne*, calling the dormant Commerce Clause "utterly illogical" and "a judicial fraud."[16] Expressing his disapproval of the doctrine, Justice Scalia wrote:

> The Court's efforts to justify this judicial economic veto come to naught. The Court claims that the doctrine "has deep roots." So it does, like many weeds. But age alone does not make up for brazen invention. And the doctrine in any event is not quite as old as the Court makes it seem. The idea that the Commerce Clause of its own force limits state power "finds no expression" in discussions surrounding the Constitution's ratification. F. FRANKFURTER, THE COMMERCE CLAUSE UNDER MARSHALL, TANEY AND WAITE 13 (1937). For years after the adoption of the Constitution, States continually made regulations that burdened interstate commerce (like pilotage laws and quarantine laws) without provoking any doubts about their constitutionality. This Court's earliest allusions to a negative Commerce Clause came only in *dicta*—ambiguous *dicta*, at that—and were vigorously contested at the time. Our first clear holding setting aside a state law under the negative Commerce Clause came after the Civil War, more than 80 years after the Constitution's adoption. *Case of the State Freight Tax*, 15 Wall. 232 (1873). Since then, we have tended to revamp the doctrine every couple of decades upon finding existing decisions unworkable or unsatisfactory. *See Quill Corp. v. North Dakota*, 504 U.S. 298, 309 (1992). The negative Commerce Clause applied today has little in common with the negative Commerce Clause of the 19th century, except perhaps for incoherence.[17]

Justice Scalia also took aim at the internal consistency test, calling it an "exercise in counterfactuals"[18] and noting that the test:

> bears no resemblance . . . to anything in the text or structure of the Constitution. Nor can one discern an obligation of internal consistency from our legal traditions, which show that States have been imposing internally inconsistent taxes for quite a while—until recently with our approval. *See, e.g., General Motors Corp. v. Washington*, 377 U.S. 436 (1964) (upholding internally inconsistent business activities tax); *Hinson v. Lott*, 8 Wall. 148 (1869) (upholding internally inconsistent liquor tax). No, the only justification for the test seems to be that this Court disapproves of "'cross-

---

[16]    *Id.* at 572 (Scalia, J., dissenting).

[17]    *Id.* at 572-73.

[18]    *Id.* at 574.

border tax disadvantage[s]'" when created by internally inconsistent taxes, but is willing to tolerate them when created by "the interaction of . . . internally consistent schemes." *Ante*, at 1802.[19]

Justice Scalia's observation that the internal consistency test does not prevent all double taxation is especially relevant here inasmuch as the tax scheme before us passes the internal consistency test yet still results in a state of affairs in which those who work across state lines are taxed more heavily than those who do not. AS Justice Scalia observed:

> The one sure way to eliminate all double taxation is to prescribe uniform national tax rules—for example, to allow taxation of income only where earned. But a program of prescribing a national tax code plainly exceeds the judicial competence. (It may even exceed the legislative competence to come up with a uniform code that accounts for the many political and economic differences among the States.) As an alternative, we could consider whether a State's taxes in practice overlap too much with the taxes of other States. But any such approach would drive us "to the perplexing inquiry, so unfit for the judicial department, what degree of taxation is the legitimate use, and what degree may amount to an abuse of power." *McCulloch v. Maryland*, 4 Wheat. 316, 430 (1819). The Court today chooses a third approach, prohibiting States from imposing internally inconsistent taxes. *Ante*, at 1802. But that rule avoids double taxation only in the hypothetical world where all States adopt the same internally consistent tax, not in the real world where different States might adopt different internally consistent taxes.[20]

As the Majority explains, Zilka argues that *Wynne* requires us to aggregate her "state" and "local" tax burden before applying the internal consistency test in order to

---

[19]     *Id.* at 575.

[20]     *Id.* at 577. Justice Scalia concluded by saying that, "[f]or reasons of *stare decisis*," he would "vote to set aside a tax under the negative Commerce Clause if (but only if) it discriminates on its face against interstate commerce or cannot be distinguished from a tax this Court has already held unconstitutional." *Id.* at 578. Justice Ruth Bader Ginsburg also authored a dissent, which Justice Scalia and Justice Elena Kagan joined. Justice Ginsburg wrote that "nothing in the Constitution or in prior decisions of this Court dictates that one of two States, the domiciliary State or the source State, must recede simply because both have lawful tax regimes reaching the same income." *Id.* at 582 (Ginsburg, J., dissenting).

determine whether the scheme as a whole discriminates against interstate commerce. In support of that argument, Zilka relies heavily upon footnote eight in *Wynne*, where the Court stated:

> to apply the internal consistency test in this case, *we must evaluate the Maryland income tax scheme as a whole*. That scheme taxes three separate categories of income: (1) the "county tax" on income that Maryland residents earn in Maryland; (2) the "county tax" on income that Maryland residents earn in other States; and (3) the "special nonresident tax" on income that nonresidents earn in Maryland. For Commerce Clause purposes, it is immaterial that Maryland assigns different labels (*i.e.*, "county tax" and "special nonresident tax") to these taxes. In applying the dormant Commerce Clause, they must be considered as one. *Cf. Oregon Waste Systems, Inc. v. Department of Environmental Quality of Ore.*, 511 U.S. 93, 102-03 (1994) (independent taxes on intrastate and interstate commerce are "compensatory" if they are rough equivalents imposed upon substantially similar events). If state labels controlled, a State would always be free to tax domestic, inbound, and outbound income at discriminatory rates simply by attaching different labels.[21]

Citing this language, Zilka contends that Pennsylvania's income tax and Philadelphia's wage tax "must be considered as one" so that "the total tax burden upon interstate commerce" can be evaluated.[22] In other words, looking at it Zilka's way, Philadelphia residents do not pay a 3.07% Pennsylvania income tax and a 3.92% Philadelphia wage tax; rather, they pay a total "state" tax of 6.99%. Similarly, those who work or live in Wilmington in essence pay a total "state" tax of 6.25%, even though 1.25% of that tax is collected by the City of Wilmington.

---

[21]     *Id.* at 564 n.8 (emphasis added).

[22]     Brief for Zilka at 8 (emphasis omitted). Zilka also cites case law which suggests that, constitutionally speaking, all "local" or "county" taxes are just state taxes by another name, since all taxing authority initially resides with the state government. *See id.* at 11 (citing *Hunter v. City of Pittsburgh*, 207 U.S. 161, 178-79 (1907) ("Municipal corporations are political subdivisions of the state, created as convenient agencies for exercising such of the governmental powers of the state as may be instructed by them.")).

Zilka relies upon the scholarship of University of Georgia Law School professor Walter Hellerstein, who argues that the internal consistency test requires courts to evaluate the total aggregate state and local tax burden in Commerce Clause cases, since all taxes in some sense are "state" taxes regardless of what the state calls them or how they are collected. Like Zilka, Professor Hellerstein believes that the Commonwealth Court's decision below was incorrect because the court failed to recognize that "all exercises of state taxing authority affecting cross-border economic activity (whether denominated state or local taxes under the taxing regime) should be evaluated at the state level and in light of the state's tax structure as a whole."[23] According to Professor Hellerstein:

> Because political subdivisions of a state are creatures of the state, their exercises of tax power are treated as the exercise of state tax power and adjudicated according to the standards restraining the exercise of state tax power. In short, the fact that the state tax power is exercised by a political subdivision of the state rather than by the state itself is of no constitutional moment. Indeed, many of the decisions delineating the constitutional limitations on 'state' taxation affecting cross-border economic activity involve local taxes.[24]

I agree with the Majority that the internal consistency test, as articulated in *Wynne*, does not mandate the sort of state-level aggregation that Professor Hellerstein describes.[25] I note that the *Wynne* Court itself did not focus its analysis on Maryland's

---

[23] Walter Hellerstein, *Are State and Local Taxes Constitutionally Distinguishable?* (Revised), TAX NOTES STATE, Vol. 103 at 755 (Feb. 14, 2022) (arguing that "the Pennsylvania Commonwealth Court's analysis in *Zilka* is fundamentally flawed because it fails to examine the constitutional issues, particularly the commerce clause's internal consistency doctrine, at the state level.") (footnote omitted).

[24] JEROME R. HELLERSTEIN & WALTER HELLERSTEIN, STATE TAXATION, ¶20.10; *see* Hellerstein, *Are State and Local Taxes Constitutionally Distinguishable?* (Revised), at 748 ("[T]axes imposed by a 'county, city, or other locality' must be evaluated as a tax at the state level and in light of the state's tax structure as a whole.").

[25] *See* Majority Opinion at 23.

*aggregate* state and local tax burden. Rather, the Court mostly ignored the "state" portion of Maryland's tax scheme (which did allow credits) and emphasized the "county" and "special nonresident" taxes (which did not allow credits).[26] So if Zilka is correct that the *Wynne* Court held that the "state and local income tax burden must be considered together,"[27] one wonders why the *Wynne* Court didn't consider the Maryland taxes together.

In fact, there would have been no need for the *Wynne* Court to aggregate the Maryland taxes, since the Court believed that the scheme was unconstitutional on its face given the lack of credits. In the *Wynne* Court's telling, the issue with the scheme was that the "county" portion of the Maryland tax and the equivalent tax on nonresidents did not give taxpayers a credit for local taxes that they paid to another jurisdiction. And if every state enacted an identical scheme, some taxpayers inevitably would be double-taxed. The *Wynne* Court even said point blank that "Maryland could remedy the infirmity in its tax scheme by offering, as most States do, a credit against income taxes paid to other States . . . . If it did, Maryland's tax scheme would survive the internal consistency test and would not be inherently discriminatory."[28]

Here, though, if every state adopted a scheme exactly like the one before us—with a 3.07% Tax A and a 3.92% Tax B, each of which gives credits for identical taxes paid elsewhere—those who live in one state and work in another would not be double-taxed, as one state's taxes will always be offset by credits for taxes paid to the other state. Thus, the tax scheme before us passes the internal consistency test as the United States Supreme Court has articulated it. Zilka did not pay more in taxes than Philadelphia

---

[26]    *Wynne*, 575 U.S. at 567-68.

[27]    Brief for Zilka at 9.

[28]    *Wynne*, 575 U.S. at 568.

residents who work in-state because Pennsylvania's tax scheme is internally inconsistent. Rather, she paid more in taxes because Pennsylvania and Delaware each have different, internally *consistent* tax schemes.[29]

Doctrinally speaking, this occurs because the United States Supreme Court's internal consistency test does not prevent all taxes that burden interstate commerce. Instead, the test:

> avoids double taxation only in the hypothetical world where all States adopt the same internally consistent tax, not in the real world where different States might adopt different internally consistent taxes. For example, if Maryland imposes its income tax on people who live in Maryland regardless of where they work (one internally consistent scheme), while Virginia imposes its income tax on people who work in Virginia regardless of where they live (another internally consistent scheme), Marylanders who work in Virginia still face double taxation.[30]

While I agree with the Majority's decision not to adopt Zilka's aggregation theory for purposes of the internal consistency test, I acknowledge the very real possibility that the Supreme Court will modify its precedent in this area, as it has many times throughout history.[31] Indeed, this case may be worthy of certiorari so that the Court can consider whether the internal consistency test should be applied as a state-level inquiry, as Zilka and Professor Hellerstein suggest. I concede that, without some form of state-level

---

[29] *Jefferson Lines, Inc.*, 514 U.S. at 185 ("Internal consistency is preserved when the imposition of *a tax identical to the one in question* by every other State would add no burden to interstate commerce that intrastate commerce would not also bear.") (emphasis added); *see Zilka*, 2022 WL 67789, at *6 ("Although we understand that [Zilka] pays more than her intrastate counterparts, such is not the result of an unconstitutional tax scheme. Rather, it is simply the 'result of the interaction of two different but nondiscriminatory and internally consistent schemes.'").

[30] *Wynne*, 575 U.S. at 577 (Scalia, J., dissenting) (emphasis omitted); *id.* ("Then again, it is only fitting that the Imaginary Commerce Clause would lead to imaginary benefits.").

[31] *Jefferson Lines, Inc.*, 514 U.S. at 180 (conceding, somewhat euphemistically, that the Court's dormant Commerce Clause jurisprudence "has taken some turns").

aggregation, a state potentially could avoid providing full credits to its residents for taxes paid to other states on income earned in the other states by authorizing cities or political subdivisions to impose a portion of the tax directly. And allowing the result in any one case to hinge on whether a given tax is labeled state, local, county, city, or non-resident is reminiscent of the unworkable formalism that the Court's modern dormant Commerce Clause cases have eschewed since *Complete Auto*.[32]

Nevertheless, I believe that the task of modifying this doctrine (if at all) should be left for the Court that invented it in the first place. While it is generally the case that state courts "should proceed cautiously when asked to be the engine of innovation in federal constitutional law,"[33] the concerns here are even more acute because the dormant Commerce Clause rests on an unstable foundation seemingly unmoored from any discernible legal principle.[34] Because I am not confident in my ability to predict the next twist or turn in the Supreme Court's ever-changing dormant Commerce Clause jurisprudence, I join the Majority's decision affirming the Commonwealth Court and distinguishing the challenged tax scheme from the one at issue in *Wynne.*

---

[32] *See Jefferson Lines, Inc.*, 514 U.S. at 181 (discussing the Court's pre-*Complete Auto* formalist approach, which was "too mechanical, too uncertain in its application, and too remote from actualities, to be of value") (citation omitted); *cf. Wynne*, 575 U.S. at 565 n.8 ("If state labels controlled, a State would always be free to tax domestic, inbound, and outbound income at discriminatory rates simply by attaching different labels.").

[33] *Commonwealth v. Molina*, 104 A.3d 430, 458 (Pa. 2014) (Castille, C.J., dissenting).

[34] *Wynne*, 575 U.S. at 575 (Scalia, J., dissenting) ("Because no principle anchors our development of this doctrine—and because the line between wise regulation and burdensome interference changes from age to economic age—one can never tell when the Court will make up a new rule or throw away an old one."); *Am. Trucking Associations, Inc. v. Smith*, 496 U.S. 167, 203 (1990) (Scalia, J., concurring) (remarking that "[c]hange is almost [the doctrine's] natural state").